**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Duskin Claude BECKER,**
**Defendant–Appellant.**

**No. 92-30480.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 1993.

Decided May 9, 1994.

**1538**

Jay W. Frank, Moule & Frank, Eugene, OR, for defendant-appellant.

Deborah Dealy–Browning, Asst. U.S. Atty., Portland, OR, for plaintiff-appellee.

Before: REINHARDT, BRUNETTI, and FERNANDEZ, Circuit Judges.

Opinion by Judge FERNANDEZ.

FERNANDEZ, Circuit Judge:

Duskin Claude Becker appeals his conviction following a court trial for one count of conspiracy to manufacture, possess with intent to distribute, and distribute methamphetamine in violation of 21 U.S.C. § 846 and two counts of manufacture of a controlled substance (methamphetamine) under 21 U.S.C. § 841(a)(1).

The sole issue we address in this opinion is whether the district court erred when it denied his motion to suppress which was premised on a violation of knock and announce requirements.[1] We conclude that it did. We reverse and remand for a new trial.

## BACKGROUND FACTS

On April 22, 1989, law enforcement agents executed searches at the residences of Jerry Donald Stewart and Ricky Lee Andrus. During those searches, they discovered an active methamphetamine lab, methamphetamine manufacturing equipment and chemicals, methamphetamine and methamphet-

amine sludge, a methamphetamine recipe, cash and jewels. Apparently in connection with their followup investigation of Stewart, government agents paid a visit to the Becker household on May 9, 1989. They were allowed in and met with him and his wife. The agents felt that he had a belligerent, hostile and argumentative attitude, and noted that he expressed some dismay about the Stewart search and about the camera that had been mounted in front of Stewart's house to monitor activities at that residence. However, he did not threaten them and they neither saw nor smelled evidence of a methamphetamine lab or other illegal activity during their visit.

A search warrant for Becker's residence was issued on June 2, 1989. The search warrant was executed on June 3, 1989 by S.W.A.T. team members of the Springfield Police Department, and members of the IRS and the Inter–Agency Narcotics Enforcement Team. The S.W.A.T. team was chosen to execute the warrant based on the officers' estimate that there was a relatively high level of danger, in light of their belief that an active methamphetamine lab was on the premises which contained volatile chemicals, the fact that in the April 22, 1989 searches of Andrus and Stewart's residences unloaded and loaded firearms had been discovered as well as an active methamphetamine lab, and the time lag between the April search and this one would have alerted Becker to possible police action and allowed him an opportunity to destroy evidence, booby trap the lab, or arm himself against the police. None of these concerns were discussed in the affidavit for the warrant. In fact, the affidavit did not request seizure of laboratory materials or weapons, and the warrant did not mention them. The officers had, by the way, given a proper knock and announce notice when they conducted the earlier searches.

The six members of the S.W.A.T. team entered the yard first to secure the premises. They assembled on the porch, and all yelled "Police—Search Warrant" loudly and repeatedly as they simultaneously kicked in the door. When the police broke in, the resi-

---

1. Becker has also raised several other challenges to his conviction and sentence. We have ad-

dressed those claims in an unpublished memorandum disposition filed this date.

dents—Becker and his young daughter— were still in their beds.

During the search, officers noticed a newly-poured concrete pad near the shop at the back of Becker's property. Officers then rented a jackhammer and removed portions of the concrete slab. They discovered pieces of aluminum foil underneath which later tested positive for methamphetamine. Based upon what they found, the agents executed a subsequent search of Becker's residence on August 22, 1989. That time they knocked before entering.

Becker filed a motion to suppress the evidence seized during the June and August searches. The district court granted in part and denied in part the motion to suppress. It granted the motion to the extent Becker sought to suppress the evidence found under the concrete pad in both the first and second searches and denied it in all other respects.

The government filed an interlocutory appeal pursuant to 18 U.S.C. § 3731. Becker also sought review of the partial denial of the motion to suppress. He argued that the knock and announce statute was violated and, therefore, the evidence from both searches should have been suppressed. In *United States v. Becker,* 929 F.2d 442, 446–47 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 183, 116 L.Ed.2d 145 (1991), we reversed the district court's order suppressing the evidence found under the concrete slab during both searches. We declined to address Becker's knock and announce argument because cross-appeals are not allowed on government interlocutory appeals under section 3731. On remand, Becker renewed his motion to suppress and added the ground that the second warrant was unauthorized and illegal due to the knock and announce violation during the first search. The district court denied the motion. It stated that it would "follow the Ninth Circuit" to the extent the motion mirrored the prior suppression motion, and determined that it was not illegal to obtain the second warrant. This appeal ensued.

## JURISDICTION AND STANDARD OF REVIEW

The trial court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

■ In general, we review determinations of motions to suppress de novo. *United States v. Khan,* 993 F.2d 1368, 1375 (9th Cir.1993). The trial court's factual findings are reviewed for clear error. *United States v. Negrete–Gonzales,* 966 F.2d 1277, 1282 (9th Cir.1992). Where no findings of fact were made or requested, this court will uphold a trial court's denial of a motion to suppress if there was a reasonable view to support it. *United States v. Rabe,* 848 F.2d 994, 997 (9th Cir.1988). The mixed fact and law question of exigent circumstances justifying a failure to comply with the statutory knock and announce provisions of 18 U.S.C. § 3109 is reviewed de novo. *United States v. McConney,* 728 F.2d 1195, 1205 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## DISCUSSION

■ When the officers obtained a warrant to search Becker's house, they decided to serve it early in the morning. They also decided to take the house by storm. Accompanied by a S.W.A.T. team, they loudly announced themselves and simultaneously kicked the door in and entered. Becker claims that in doing so the police ignored his constitutional rights and centuries of law. He is correct.

As we said in *Los Angeles Police Protective League v. Gates,* 907 F.2d 879, 884 (9th Cir.1990):

Nowhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved. *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886); *United States v. Shaibu,* 895 F.2d 1291, 1293 (9th Cir.1990); *United States v. Winsor,* 846 F.2d 1569, 1574 (9th Cir.1988) (en banc). The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment. Therefore, we have been adamant in our demand that absent exigent circumstances a warrant will be required before a person's

home is invaded by the authorities. *See Shaibu,* at 1293; *United States v. George,* 883 F.2d 1407, 1411, 2522 (9th Cir.1989).

But the protection offered by the Fourth Amendment and by our law does not exhaust itself once a warrant is obtained. The concern for the privacy, the safety, and the property of our citizens continues and is reflected in knock and announce requirements. It finds expression in the knock and announce statute which allows an officer to "break open any outer or inner door of a house ... to execute a search warrant if, after notice of his authority and purpose," he is refused admittance. 18 U.S.C. § 3109. Nor should the safety and property "emanations from the core of the fourth amendment" be overlooked by too exclusive a focus on the privacy factor. *United States v. Lockett,* 919 F.2d 585, 592 (9th Cir.1990) (Fernandez, J., concurring).

The fear of a smashing in of doors by government agents is based upon much more than a concern that our privacy will be disturbed. It is based upon concern for our safety and the safety of our families. Indeed, the minions of dictators do not kick in doors for the mere purpose of satisfying some voyeuristic desire to peer around and then go about their business. Something much more malevolent and dangerous is afoot when they take those actions. It is that which strikes terror into the hearts of their victims. The fourth amendment protects us from that fear as much as it protects our privacy....

The knock and announce requirement, including its safety purposes, was reported on by Sir Edward Coke. *See Semayne's Case,* 5 Coke's Rep. 91a (K.B.1603). And, as Justice Story indicated in his commentaries, the fourth amendment was designed to protect "personal security, personal liberty and private property." *See* J. Story, *Commentaries on the Constitution of the United States,* § 1902 (2d ed. 1851). These concerns go far beyond mere privacy interests.

Similar concerns have been expressed throughout our history. *See, e.g., Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (personal security); *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (knock and announce); *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921) (personal security), *overruled on other grounds,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886) (personal security), *overruled on other grounds,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

*Id. See also Soldal v. Cook County,* — U.S. —, —, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992) (the Fourth Amendment "protects property as well as privacy"). Of course, we recognize that in *Lockett* we held that suppression was not a proper remedy when all a person could say was that his safety interests had been jeopardized by a knock and announce violation. 919 F.2d at 588–90. That has no application to this case. Here Becker had privacy, property and safety interests, all of which were entitled to protection.

In their rush to execute the warrant, the government agents forgot all of this. The timing and manner of their search ignored all of the concerns and dangers that knock and announce requirements are designed to obviate. They assert that their lapse is excused because their fear of the dangerousness of Mr. Becker generated exigent circumstances which overcame any need to follow knock and announce requirements.

While it is true that "exigent circumstances" can justify immediate entry, incantation of that phrase does not dissolve the shield that our law provides. We have held that even a mild exigency, like knowledge that a person is dangerous, can justify immediate entry where that can be done without any physical destruction of property. *See United States v. McConney,* 728 F.2d 1195, 1206 (9th Cir.1984) (en banc) (opening of an unlocked screen door). *See also United States v. Arias,* 923 F.2d 1387, 1391 (9th Cir.1991) (mild exigency is sufficient where entry can be made without physical destruction of property). That, of course, is not this case. Here the officers had to kick their way through a locked door in order to get at the home's occupants, who were still in bed.

To justify physical destruction of property "[m]ore specific inferences of exigency are necessary." *McConney*, 728 F.2d at 1206. Still, not every generalized fear can create an exigency. For example, in *United States v. Mendonsa*, 989 F.2d 366 (9th Cir.1993), we found insufficient exigency to justify breaking into a house after an announcement and a wait of three to five seconds. *Id.* at 370. The offered justification was the occupant's prior conviction for armed robbery, the "inherently dangerous job of arresting drug dealers," and a little noise inside the house, which was not at all unusual. *Id.* at 370–71. We were similarly unimpressed in *United States v. Moreno*, when we were told that the officers feared destruction of evidence, not because they had any specific facts but because there always was a danger in drug cases. 701 F.2d 815, 817–18 (9th Cir.1983), *vacated on other grounds*, 469 U.S. 913, 105 S.Ct. 286, 83 L.Ed.2d 223 (1984). Nor were we convinced in an earlier case when the government merely claimed that one of the occupants of an apartment owned a gun and that there was a general fear that narcotics might be destroyed. *United States v. Fluker*, 543 F.2d 709, 717 (9th Cir.1976). In short, while peril to officers or the possibility of destruction of evidence or escape may well demonstrate an exigency, mere unspecific fears about those possibilities will not. Were they enough, the knock and announce statute would have been judicially amended to exclude virtually all narcotics-based cases. It has not been.

Yet each of the concerns alleged in this case is of just that nature. For example, the police had no information that a methamphetamine laboratory was then being operated on Becker's premises. Indeed, given the fact that his associates' homes had been searched two months earlier and that he had been questioned by police, he would have been exceedingly foolhardy if he had still been operating a laboratory at that site at that time. The police had been on the premises but had never seen or smelled one there, and the last cook they knew about had taken place at Becker's home in November, 1988. Yet, one of the expressed fears was that Becker might have an active laboratory and that those were sometimes boobytrapped.

As it turned out, life followed logic; Becker had no operating methamphetamine lab. Rather, he had, if anything, attempted to destroy all evidence of the lab long before the raid ever took place. Of course, we recognize that what was discovered later is not relevant to assessing police activity at the time of the entry. We mention it only to emphasize the fact that the claimed fear was simply a generalized and non-specific one.

Also, although there was no specific information that Becker himself was armed or dangerous, the officers decided that he might be. Two months earlier the police had served warrants at his associates' homes. Proper knock and announce notice was given and the searches took place without incident. However, guns were found. That is far from showing an exigency regarding Mr. Becker, a person who was then 42 years of age and had, to all appearances, led a law-abiding, even exemplary, life up until this series of incidents.

None of this describes even a mild exigency, much less an exigency justifying breaking into a family home early one morning without complying with the simple and ancient requirement that the officer "ought to signify the cause of his coming, and to make request to open doors" before he breaks in. *Semayne's Case*, 5 Coke's Rep. 91a, 91b (K.B. 1603).

## CONCLUSION

Today, we reemphasize that the Fourth Amendment "protects property as well as privacy" and that the key to discerning a constitutional violation under that amendment "is the intrusion on the people's security from governmental interference." *Soldal*, —— U.S. at ——, 113 S.Ct. at 548. We hold that Becker's statutory and Fourth Amendment rights were violated by the intrusion of government agents into his home during the early morning hours, without compliance with knock and announce requirements.

We reverse and remand for a new trial, in which the evidence seized during the June 1989 search as well as any evidence obtained in reliance upon the fruits of that search, including the evidence obtained during the

August 1989 search, shall be excluded.[2] Were we to do less, we would fail to protect an imposing tree in the forest of our liberties whose seeds were wrested from the hands of ancient monarchs, planted by legal giants, and nurtured by patriots for centuries. Then we would surely have to bow our heads when asked where we would hide when the Devil turned round on us. *See* Robert Bolt, *A Man for All Seasons* 66 (Vintage International Ed.1990).

**REVERSED AND REMANDED.**

---

**2.** The government does not assert that if there was a knock and announce violation only a part of the fruits of the searches should be suppressed. We therefore assume, *inter alia,* that the places searched were all part of the house for this purpose. *See United States v. Lopez,* 898 F.2d 1505, 1511 (11th Cir.1990); *United States v. Frazin,* 780 F.2d 1461, 1467 n. 6 (9th Cir.), *cert. denied,* 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986); *United States v. Bustamante–Gamez,* 488 F.2d 4, 9 n. 5 (9th Cir.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); *United States v. Mullin,* 329 F.2d 295, 298 (4th Cir.1964).