66 F.3d 337
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee
v.
Charles Elton WATSON, Defendant-Appellant.
 No. 94-10354.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 10, 1995.
Decided Sept. 6, 1995.
 
 1
 Before: CANBY, FERNANDEZ, Circuit Judges, and FITZGERALD*, District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Charles Elton Watson appeals his conviction following a jury trial for armed bank robbery in violation of 18 U.S.C. Sec. 2113(a) & (d). Watson contends the district court erred by denying his motion to suppress statements made to an FBI agent while released on bail after being questioned by local police and invoking his right to an attorney. Watson also contends the district court erred in denying his motion to suppress voice identification evidence because the pre-trial lineup was unduly suggestive.
 
 I.
 
 4
 On September 27, 1993 at approximately 11:15 a.m., the California Republic Bank in Greenfield, California was robbed by a man wearing a cowboy hat, plaid shirt, blue Levi's, dark shoes, and a bandanna across his face. The robber brandished a gun and yelled, "you're being robbed," and then told everyone to get down onto the floor.
 
 
 5
 The robber approached a bank teller window staffed by Alejandra Lara and ordered her to get up and give him her money. He warned her not to put a dye pack or explosives in with the money or he would come back and kill everybody. She gave him $3,876 from her drawer, put it into a bag, and included a dye pack.
 
 
 6
 The robber then pointed his gun at another teller, Gerson Fombona, and ordered him to put money into the bag without a dye pack. Fombona complied and put $4,352 from his teller drawer into the bag.
 
 
 7
 As the robber left the bank, employee Stacy Springman observed the robber, through a window, climb into a light blue, four-door sedan. Springman shouted the license plate numbers, "2GIW017" while another employee, Yolanda Villareal, wrote the numbers onto a slip of paper. The next day, Springman identified a 1987 Pontiac J6000 as the vehicle used in the robbery. The Pontiac was parked two blocks away from the California Republic Bank at the LWB Used Car Lot.
 
 
 8
 Lloyd W. Biter, the owner of the LWB Used Car Lot, testified that he had known Watson for three years prior to the robbery. Biter identified the Pontiac as a car he owned and was trying to sell. Biter also testified that he had previously allowed Watson to borrow the Pontiac several times because Watson expressed an interest in buying the vehicle. Prior to the robbery, Biter had loaned Watson $140. On September 28, 1993, the day after the robbery, Watson visited the car lot and repaid Biter with two $100 bills. Later, when sheriff's deputies examined these two bills, Biter and the deputies noticed a red tint along an edge of the bills.
 
 
 9
 James P. Loving lived in a motorhome parked on the LWB Used Car Lot. Loving knew Watson and was also aware that Watson had borrowed the Pontiac several times prior to the day of the robbery. On the morning of the robbery, September 27, 1993, the car lot was closed and the gate locked. Around 10:30 or 11:00 a.m., Watson telephoned Loving claiming that he was having car problems and wanted to borrow the Pontiac. Loving offered the use of his pickup, but Watson responded that he preferred the Pontiac. Watson took the Pontiac from the lot at approximately 11:00 a.m. and returned it at approximately 11:30 a.m.. Loving testified that no one other than Watson borrowed the Pontiac on the day of the robbery.
 
 
 10
 After speaking with Biter and Loving, sheriff's deputies visited Watson's home to question him about borrowing the Pontiac. Watson was then arrested and taken to a jail facility where $740 in currency was seized. At the time of the seizure, Sheriff Deputy Roy Bertolucci observed a red color along the edges of the bills. Upon being read his Miranda rights, Watson asked to speak to an attorney and all questioning ceased.
 
 
 11
 After Watson had been released on bail, FBI Special Agent Scott Saxon came to Watson's home on October 6, 1993. Agent Saxon was aware that Watson had earlier invoked his right to an attorney. In answer to Special Agent Saxon's questions, Watson stated the he had borrowed the Pontiac in order to purchase auto parts and that no one else borrowed the Pontiac from him.
 
 
 12
 The Pontiac was examined by Special Agent Saxon who seized the right front floor mat. Agent Saxon also took sample fibers for chemical analysis from the carpet over the floor boards. Chemical analysis conducted by FBI forensic chemist Robert Rooney revealed that the $740 seized from Watson, the floor mat, and the carpet fibers contained the chemical methylamino-anthraquinone ("MAAQ"), which is present in the dye packs used by the California Republic Bank. The sample from the two $100 bills seized from Biter was too small for Rooney to conclude the bills contained MAAQ, but he observed spots consistent with MAAQ's presence.
 
 
 13
 On October 26, 1993, Watson was ordered to appear in a live lineup and a voice lineup. The attorney present for Watson objected to both the appearance of the participants in the lineup and the voice identification.
 
 
 14
 Robbery witness statements indicated that the robber spoke with a slight drawl which was also described as "country type talk that a lot of their [the bank] customers use, a lot of the farmers from around the area, a sort of laid back, okie type of slang," a "deep gravely voice" and a "good ol' boy," "country" accent. The lineup included five men. The defense contends that only Watson had an accent. The defense also requested that the voice lineup be recorded on videotape and offered a videocamera. This request was refused.
 
 
 15
 FBI Special Agent Thomas Forgas testified as an expert in photographic evidence. Using the photos taken by bank surveillance cameras and employing his knowledge of photogrammetry, he testified that he concluded the bank robber was 6' 4"' tall. A certified copy of the Watson's California Department of Motor Vehicles record revealed his height as 6' 4"'.
 
 
 16
 On April 18, 1994, a Motion to Suppress Statement based on Miranda and Edwards was denied by the judge. Trial commenced on April 19, 1994. After a four day trial, the jury returned a guilty verdict on April 25, 1994. On June 20, 1994, Watson was sentenced to 78 months in custody. Watson filed a timely notice of appeal on June 28, 1994.
 
 
 17
 The district court had jurisdiction under 18 U.S.C. Sec. 3231 for a violation of 18 U.S.C. Secs. 2113(a) and (d), armed bank robbery. This court has jurisdiction under 28 U.S.C. Sec. 1291.
 
 II.
 
 18
 A. Denial of Motion to Suppress Statement Made to Agent Saxon
 
 1. Standard of Review
 
 19
 Generally, motions to suppress are reviewed de novo. United States v. Becker, 23 F.3d 1537, 1539 (9th Cir.1994). The trial court's factual findings concerning whether a defendant invoked a right to counsel are reviewed for clear error. United States v. Ogbuehi, 18 F.3d 807, 812 (9th Cir.1994).
 
 
 20
 2. Was Watson "in Custody?"
 
 
 21
 Watson appeals the denial of his motion to suppress statements made to the FBI special agent after previously requesting counsel while being questioned by deputy sheriffs. In Miranda v. Arizona, the Supreme Court held that, in order to protect a defendant's rights against compelled self-incrimination under the Fifth Amendment, before police initiate custodial interrogation, they must, in addition to other rights, advise a defendant that he has a right to counsel and a right to remain silent. 384 U.S. 436, 467-72 (1966). "The right to counsel established in Miranda was one of a 'series of recommended 'procedural safeguards' ... [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected.' " Davis v. United States, 114 S.Ct. 2350, 2354 (1994). The Supreme Court added an additional layer to that protection in Edwards v. United States, 451 U.S. 477 (1981), and its progeny, by holding that once a defendant invokes his right to counsel under Miranda, the defendant must reinitiate contact in order for the authorities to resume interrogation. "It remains clear, however, that this prohibition on further questioning--like other aspects of Miranda--is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." Connecticut v. Barrett, 479 U.S. 523, 528 (1987).
 
 
 22
 Of course, the Miranda right to counsel attaches only in the context of custodial interrogation. It differs from the Sixth Amendment right to counsel where once the government initiates formal charges against the defendant, he has a right to counsel at all future "critical stages." See Maine v. Moulton, 474 U.S. 159, 168-70 (1985). Since Watson had not been formally arraigned when questioned by Special Agent Saxon, Sixth Amendment arguments do not apply.
 
 
 23
 The phrase "custodial interrogation" was defined in Miranda. The Miranda court put it this way, "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. A significant deprivation of freedom as envisioned by Miranda was "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." 384 U.S. at 445. "Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 114 S.Ct. 1526, 1529 (1994).
 
 
 24
 The day after the bank robbery, Kern County Sheriff's deputies visited Watson at home and asked him what he knew about the robbery. Watson was then arrested and advised of his Miranda right en route to the jail. Watson elected to speak with an attorney prior to being questioned further. He was booked into jail and then released on bail before appearing for arraignment. Watson was instructed to appear in court approximately ten days later.
 
 
 25
 On October 6, 1993, prior to the scheduled arraignment, Special Agent Saxon visited Watson's home to question him.[1] At the front door, Saxon asked Watson if they could talk. A barking dog made it difficult to speak in the doorway so they went into the front yard. Watson asked to sit down inside Saxon's car. Watson was not placed under arrest by the special agent during or after their conversation.
 
 
 26
 Watson stated, inter alia, that he had a problem with the fuel filter on his vehicle so he called J.P. Loving at LWB Used Cars hoping to borrow a vehicle so that he could buy a new fuel filter. He borrowed the Pontiac at the LWB car lot and drove north on South Union Avenue to an auto parts store located near the South Union Truck Repair. That store did not have the filter he needed so he then planned to drive to a dealership. Watson stated he returned to the car lot and disconnected the fuel filter on his car.
 
 
 27
 According to the Stansbury test, the objective circumstances of the special agent's questioning does not rise to the level of custody. Watson was released on bail, and while the conditions of bail may contain restrictions, Watson was released prior to arraignment in state court. Bail restrictions, like a release on one's own recognizance, may be minimal. Such restrictions do not amount to a custodial atmosphere sufficient to deprive Watson of his freedom in a significant way.
 
 
 28
 This court has held that Edwards does not apply to suspects who do not remain in continuous custody between the time they first request counsel and the time they are reinterrogated. United States v. Skinner, 667 F.2d 1306, 1309 (9th Cir.1982), cert. denied, 463 U.S. 1229 (1983). Skinner was followed by United States v. Hines, 963 F.2d 255, 256-57 (9th Cir.1992), which held that the defendant could not claim Fifth Amendment protection for two distinct reasons: "(1) there was a break in custody between the first and second interviews, and (2) the district court found that Hines knowingly and intelligently waived his right to counsel at the second interview."
 
 
 29
 In support of his argument that Edwards was violated, Watson relies upon Minnick v. Mississippi, 498 U.S. 146 (1990) and United States v. Lucas, 963 F.2d 243 (9th Cir.1992), for the proposition that once counsel has been requested, law enforcement may not resume questioning without counsel present. But in both of these cases the defendant actually remained in continuous custody after the defendant requested to meet with counsel.
 
 
 30
 Here, we conclude that Watson was not in custody at the time of Special Agent Saxon's interview and therefore repeated Miranda warnings were not required. Michigan v. Jackson, 475 U.S. 625, 629 (1986). Given that Watson was not in custody, there is no Edwards violation. The district court did not err in denying Watson's motion to suppress on the basis of a claimed Miranda or Edwards violation.
 
 
 31
 3. Was FBI Questioning Fruit of the Poisonous Tree?
 
 
 32
 Watson, for the first time on appeal, argues that the questioning conducted by Agent Saxon was a product of earlier illegal questioning by Kern County Sheriff Deputies and should therefore have been suppressed.
 
 
 33
 Ordinarily, issues not presented to the trial court may not be raised for the first time on appeal. United States v. Flores-Payton, 942 F.2d 556, 558 (9th Cir.1991). However, where the issue involved is purely legal, this court has discretion to reach it despite failure to properly preserve the objection. Id. In the instant case, even assuming that the government conceded that Kern County Sheriff Deputies violated Watson's Miranda rights, the record fails to reveal that Special Agent Saxon relied upon information received from Sheriff Deputies or from witnesses Biter and Loving. Watson's failure to raise such an objection before the district court does not amount to an "exceptional circumstance" as established by Flores-Payton. We decline to address this issue for the first time on appeal and need not conduct harmless error analysis.
 
 
 34
 B. Denial of Motion to Suppress Voice Lineup
 
 1. Standard of Review
 
 35
 In determining whether an out-of-court identification procedure is so impermissibly suggestive as to taint subsequent identification testimony in deprivation of a defendant's due process rights, this court examines the totality of the surrounding circumstances. United States v. Nash, 946 F.2d 679, 681 (9th Cir.1991). The standard of review is probably de novo. See id. (noting conflict in circuit and suggesting that review is de novo). The admission of pretrial identification violates due process of law where the identification procedure creates a "very substantial likelihood of irreparable misidentification." United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir.1985) (internal quotations omitted).
 
 
 36
 2. Motion to Suppress Voice Identification Evidence
 
 
 37
 Watson contends that the pretrial voice lineup was unduly suggestive because he was the only person in the lineup of his size that spoke with a country drawl.
 
 
 38
 Five men of similar age and build were presented in the lineup. Two of the five men spoke with a country drawl. None of the witnesses who appeared at the voice lineup had previously described the robber as speaking with a country drawl or "Okie" accent. Only Kathy Lostertter, the bank's manager and Stacy Springman, the assistant manager, described the robber as having a country drawl or "Okie" accent. Obviously, the witnesses at the lineup did not have a preconceived notion that the robber had a particular accent.
 
 
 39
 Alejandra Lara identified Watson (number two in the lineup) based upon his build and his hands. Kelly Moe identified a man (numbered three in the lineup) based on his height and size. Stacy Springman was not present at the voice lineup, but in viewing photographs, selected the men (numbered two and three) based on their size, height, and build. Elizabeth Szymanski identified Watson based upon his voice, though she admitted she was not positive about this identification. Jack Porch, a bank customer and defense witness, identified a man (numbered four in the lineup) as the robber.
 
 The district court found:
 
 40
 [t]hat this lineup was not unnecessarily suggestive as argued by defendant. Because not all of the witnesses described the robber as having a 'country' or 'okie' accent and none of the witnesses who viewed the lineup described such an accent, the court fails to see any unnecessarily suggestive procedure involved in this lineup.
 
 
 41
 Order re: Defense Motions, Jan. 10, 1994. The district court cited United States v. Johnson, 820 F.2d 1065, 1073 (9th Cir.1987) and Davenport, 753 F.2d at 1462-63, as stating that an identification procedure is not unduly suggestive where the defendant is the only person to appear in both the photo lineup and an actual lineup.
 
 
 42
 We agree with the district court. There is no indication from the record that the lineup procedure was overly suggestive. The witnesses who had mentioned that Watson spoke with a country accent were not present at the voice lineup.
 
 
 43
 3. Failure to Record Lineup on Videotape.
 
 
 44
 Watson further argues that the failure to videotape the voice lineup constitutes a due process violation. The government cites Arizona v. Youngblood, 488 U.S. 51, 58 (1988), which posits two requirements the defendant must prove to establish a due process violation: (1) the evidence not preserved is potentially exculpatory; and (2) that the police acted in bad faith in not preserving the evidence. This court, in Mitchell v. Goldsmith, 878 F.2d 319, 322-23 (9th Cir.1989), followed Youngblood in holding "even if the evidence was potentially useful, the state record fails to support a finding of bad faith on the part of the police.... In the absence of bad faith, failure to preserve the lineups does not constitute a denial of due process of law." "The presence or absence of bad faith turns on the government's knowledge the apparent exculpatory value of the evidence at the time it was lost or destroyed." United States v. Cooper, 983 F.2d 928, 931 (9th Cir.1993). We do not find the appearance of bad faith on the part of the investigating officers. Prior to the creation of any evidence, exculpatory or incriminatory, the FBI chose not to employ a particular means to preserve it. This is not the destruction of evidence. Additionally, two witnesses mistakenly identified the robber and their identifications were admitted at trial. Because we conclude that the trial court did not err it is unnecessary to consider the government's suggestion to undertake harmless error analysis.
 
 C. Sufficiency of the Evidence
 1. Standard of Review
 
 45
 There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Lennick, 18 F.3d 814, 819 (9th Cir.), cert. denied, 115 S.Ct. 162 (1994).
 
 2. Discussion
 
 46
 Reviewing the evidence in the light most favorable to the government, the evidence at trial reveals that the bank manager, Kathy Lostertter, noticed a man, whom she subsequently identified as Watson, behaving suspiciously as if he was "casing" the bank three days before it was robbed. Watson was observed entering from the east door and exiting from the west door without stopping to speak with anyone in the bank. Bank records indicated that Watson has never been a customer of this bank.
 
 
 47
 Bank employees described the robber as a very tall, middle aged, white male with blue eyes and weighing approximately 200 to 240 pounds. Thomas Forgas, an expert in photographic evidence with the FBI testified that he was able to determine that the bank robber was 6'4"' tall. Watson's California DMV records indicate that he is 6'4"', weighs 250 pounds, and has blue eyes. The jury could obviously see that Watson is a white, middle aged man.
 
 
 48
 The bank robbery occurred on September 27, 1993, around 11:15 in the morning. J.P. Loving testified that Watson borrowed a blue 1987 Pontiac with a California plate 2GIW017 at 11:00 a.m. and returned it about 11:30 a.m. on the day of the robbery. Stacy Springman saw the robber leave in a car with the plate 2GIW017 which she read aloud enabling Linda Villareal to write down the number. The floormats and carpet samples from inside the Pontiac tested positive for MAAQ, an agent present in the dye packs used by the bank. The used car lot is located two blocks from the bank. Answering Special Agent Saxon's question, Watson admitted driving the Pontiac and stated no one else drove the vehicle.
 
 
 49
 On September 28, 1993, the morning after the robbery, Watson repaid his friend Lloyd Biter, owner of the used car lot, with two $100 bills that had a red tint along the edges. Later that day, sheriff's deputies recovered $740 from Watson's pockets. That currency tested positive for the presence of MAAQ.
 
 
 50
 Watson was unemployed at the time of the robbery. His wife worked part time at a dry cleaner. On September 27, 1993, he was three months behind on his mortgage payments and in danger of foreclosure. Approximately one week after the robbery, Watson paid $800 toward his mortgage. On October 29, 1993, Watson paid an additional $386.01, thereby becoming current on his mortgage payments. Watson also repaid a friend $140 the day after the robbery. Seven hundred and forty dollars was recovered from Watson's pockets when he was booked into jail.
 
 
 51
 The jury could reasonably conclude from all of this evidence that Watson was guilty of armed bank robbery.
 
 III.
 
 52
 The judgment of conviction is AFFIRMED.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior U.S. District Judge for the District of Alaska, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Following oral argument, counsel for Watson filed a copy of a state complaint for bank robbery with this court pursuant to Fed.R.App.P. 10(e). This information was not in the record originally furnished to the panel. Regardless, Watson was arraigned on October 8, 1993 and questioned by the special agent at his home on October 6, 1993, hence Watson's arraignment in state court does not affect his Fifth or Sixth Amendment rights concerning the questioning on October 6, 1993