73 F.3d 371
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Mark HURST, Defendant-Appellant.
 No. 95-10053.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 17, 1995.
Decided Dec. 29, 1995.
 
 Before: SCHROEDER, FLETCHER, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellant Mark Hurst challenges the District Court's denial of his motion to suppress evidence seized by the United States at a roadblock inside Yosemite National Park. We have jurisdiction under 28 U.S.C. Sec. 1291 and affirm.
 
 BACKGROUND
 
 3
 Seventeen automobile burglaries occurred in Yosemite National Park between July 12 and July 20, 1994. Similarities among the burglaries included the method of entry, the types of items taken, the type of vehicles entered, and the location of the break-ins. At approximately 1:30 a.m. on July 21, 1994, a caller to the park's 911 service reported hearing the breaking of glass coming from a parked vehicle similar to those burglarized earlier and seeing a figure lurking in the bushes nearby. The incident was reported to have occurred in a parking lot near the prior burglaries. (Subsequent investigation revealed that the caller had in fact witnessed a bear breaking into an automobile by smashing a window.) Park ranger Christopher Pergiel was notified of the call at 1:35 a.m. and drove to the only legal exit from the area. When he arrived at about 1:40 a.m., Pergiel parked so that oncoming drivers would not see his patrol car until they were a hundred yards away; when a vehicle approached, Pergiel turned on his flashing lights, stood in the road shining his flashlight in order to stop the vehicle, and questioned its occupants. Pergiel stopped five vehicles in this way, including, at about 2:00 a.m., one driven by Hurst. Pergiel observed both that Hurst was wearing athletic gloves, which struck him as unusual for one driving a car particularly given the warm temperature, and that the rear of the vehicle contained a good deal of assorted equipment and clothing. When Hurst got out of the vehicle to retrieve his driver's license from the trunk, Pergiel noticed on the floorboard a large flathead screwdriver that seemed to match the general description of the burglary tool used in the other break-ins. Pergiel obtained permission to search the vehicle from its owner, Hurst's passenger, and discovered numerous items that appeared to match the description of property reportedly stolen in the previous burglaries. Pergiel then arrested the two men and a subsequent search of Hurst's home, authorized by warrant, turned up additional property matching that reported stolen in the burglaries.
 
 
 4
 Hurst was indicted for receiving stolen property, 18 U.S.C. Sec. 662, and larceny and aiding and abetting, 18 U.S.C. Secs. 661 and 2. His motion to suppress all of the evidence against him on the grounds that the stop was an unconstitutional seizure was denied. Hurst pled guilty, preserving for appeal the question of the constitutionality of the stop and subsequent search, and was sentenced to five concurrent terms of 16 months imprisonment, a $250 special assessment, and three years supervised release.
 
 STANDARD OF REVIEW
 
 5
 Generally, motions to suppress are reviewed de novo. United States v. Becker, 23 F.3d 1537, 1539 (9th Cir.1994). The district court's factual findings are reviewed for clear error. Id., 23 F.3d at 1539.
 
 DISCUSSION
 
 6
 The roadblock in this case was not a checkpoint such as the ones considered in United States v. Martinez-Fuerte, 428 U.S. 543 (1976), and Michigan Dept. of State Police v. Sitz, 496 U.S. 444 (1990), in which the Court approved checkpoints that stop drivers without individualized suspicion in order to detect aliens in the country illegally or drunk drivers. At the same time, Pergiel's roadblock differs from the stops evaluated in Delaware v. Prouse, 440 U.S. 648 (1979), and United States v. Brignoni-Ponce, 422 U.S. 873 (1975), in which the Court held discretionary spot checks of automobiles by roving patrols unconstitutional where officers, without an articulable and reasonable suspicion of a violation of the law, sought to check for license and registration compliance or for the legality of the occupants' presence in the country.
 
 
 7
 The roadblock challenged here must be analogized to the checkpoints considered in Martinez-Fuerte and Sitz under our decision in United States v. O'Mara, 963 F.2d 1288 (9th Cir.1992), where
 
 
 8
 park rangers, having received reports of illegal firearms discharges in the Joshua Tree National Monument, began stopping all outgoing cars along the only exit route from the campground area where the discharges were reported. Their purpose was to question exiting visitors briefly. Witnesses had furnished descriptions of suspects and the park rangers were also looking for persons fitting these descriptions.
 
 
 9
 Id. at 1291. The rangers eventually stopped a vehicle occupied by two persons who matched the witnesses' descriptions, and a subsequent search of the vehicle revealed several weapons. This court upheld the lawfulness of the seizure under the rationale of Sitz, where the Supreme Court evaluated the constitutionality of sobriety checkpoints by applying the balancing test of Brown v. Texas, 443 U.S. 47 (1979): "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Id., at 50-51. The O'Mara decision thus dictates that this balancing test provides the proper standard for reviewing the roadblock seizure challenged by Hurst.
 
 
 10
 Appellant's attempts to distinguish O'Mara from the facts of this case are not persuasive. While Pergiel, unlike the officers in O'Mara, did not have a description of the suspects in the crime or of any vehicle such suspects might have been using, he did know the method of entry that had been used in the prior burglaries and the types of items that had been taken, so he was not merely hoping to find any incriminating evidence without knowing what he was looking for. And even assuming for argument's sake that an automobile burglary poses less of a danger to public safety than did the discharge of weapons in O'Mara, that would mean only that the government interest to be balanced in evaluating the roadblock would not be as strong as the interest presented in O'Mara, not that the balancing should not be performed at all.
 
 
 11
 The first factor to be considered in determining the reasonableness of the stop is "the gravity of the public concerns served by the seizure". Brown, 443 U.S. at 51. There is a clear government interest in apprehending the perpetrators of a series of automobile burglaries occurring over one week in a single national park.
 
 
 12
 The second factor is "the degree to which the seizure advances the public interest". Id. The circumstances and the method in which the roadblock was established demonstrate that it advanced the cause of apprehending the burglars significantly. The 911 call reported evidence of an automobile burglary in the same area and at the same time of day that previous burglaries had occurred, including burglaries earlier that day. The roadblock was positioned at the only legal road exit from that area, making it likely that if any suspects were in a vehicle, they would pass that location. Only ten minutes passed between the time of the 911 report and the placement of the roadblock. Although the 911 caller gave no description of any property stolen in the reported burglary or of any suspects reportedly involved, and no information that any suspects were in a vehicle, Pergiel did have descriptions of both the type of property taken and the type of forced entry made in the previous 17 burglaries. Because the roadblock offered a substantial possibility of intercepting fleeing suspects, it advanced the public interest in solving the automobile burglaries to a significant degree, and therefore this factor weighs heavily in favor of the constitutionality of the seizure.
 
 
 13
 The third factor to be considered is "the severity of the interference with individual liberty". Id. This factor involves both the objective intrusion on those stopped at the roadblock, "measured by the duration of the seizure and the intensity of the investigation", Sitz, 496 U.S. at 452, as well as the subjective intrusion, including "the fear and surprise engendered in law-abiding motorists by the nature of the stop", id.; see also Martinez-Fuerte, 428 U.S. at 557-59. The objective intrusion of the roadblock here was minimal. Because it took place in the early hours of the morning within a national park, it was likely that the "overall degree of interference with legitimate traffic", Martinez-Fuerte, 428 U.S. at 558, would be low. The drivers other than Hurst who were stopped were detained for only ten to forty-five seconds. This is comparable to the "brief detention" in Martinez-Fuerte, 428 U.S. at 558, and the average twenty-five-second delay in Sitz, 496 U.S. at 448. The investigation of those drivers was also limited; Pergiel shone his flashlight in the windows of the vehicles and asked the occupants where they had come from and where they were headed. This, too, was in line with Martinez-Fuerte, where "visual inspection of the vehicle is limited to what can be seen without a search", 428 U.S. at 558, and Sitz, where drivers were "briefly examined for signs of intoxication", 496 U.S. at 444.
 
 
 14
 The roadblock's subjective intrusion into individual liberty was more substantial. The level of "fear and surprise engendered in law-abiding motorists", Sitz, 496 U.S. at 452, was potentially high: Pergiel's car was concealed so as to surprise motorists coming upon it in the early morning dark. While the subjective intrusion of this roadblock was greater than that of the immigration and sobriety checkpoints in Martinez-Fuerte and Sitz, which were well lit, marked in advance, and conducted in a way that reassured motorists, Pergiel's roadblock was much less intrusive than the roving-patrol stops disapproved by the Supreme Court, in which patrolling officers chose vehicles to stop without either a particularized suspicion of a violation or supervision from higher authorities. See Prouse, 440 U.S. at 661-63; Brignoni-Ponce, 422 U.S. at 882-83. Significantly, Pergiel did not exercise "unfettered discretion" in siting or operating the roadblock. The site chosen--the only legal vehicle exit from the area of the reported burglary--was the most likely place that any suspects or witnesses leaving the scene might be encountered, and the roadblock was part of a larger law enforcement effort designed to solve the burglaries, including increases in patrols and plain-clothed surveillance officers. Pergiel also exercised no discretion as to whom to stop. He stopped every vehicle leaving the area of the reported burglary; indeed, such uniform application of the roadblock was essential if it was to offer any reasonable possibility of identifying suspects or witnesses.
 
 
 15
 On balance, Pergiel's seizure of Hurst was not unreasonable. The gravity of the public concern served by the roadblock, though lesser than that involved in O'Mara or in the immigration and sobriety checkpoint cases, sufficed to justify the moderately severe interference with individual liberty that the narrowly tailored roadblock entailed, given the substantial degree to which the roadblock advanced the public concern. The denial of the motion to suppress is
 
 
 16
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3