**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Mark James KNIGHTS; Steven Simoneau, Defendants–Appellees.**

**No. 99–10538.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 2000.

Filed Aug. 3, 2000.

Martha Boersch, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellant.

Hilary A. Fox, Assistant Federal Public Defender, Oakland, California, for the defendant-appellee.

Before: CANBY, REINHARDT, and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

The United States appeals from an order which suppressed evidence seized from the home of Mark James Knights in a warrantless search conducted by members of the Sheriff's Department of Napa County, California. It claims that the evidence was properly seized during a probation search. The district court disagreed; so do we. We affirm.

# BACKGROUND

From 1996 on, Pacific Gas and Electric Company's facilities in Napa County had been subjected to vandalism over 30 times. Those incidents included short circuits caused by throwing chains onto transformers, damaging of gas power switches, and damaging of power pole guy wires. Suspicion had focused on Knights, and on his friend, Steven Simoneau. Many things contributed to that. In the first place, those vandalisms started after Knights' electrical services had been discontinued in March of 1996 because he not only did not pay his bill, but also had found a way to steal services by bypassing PG & E's meter. Detective Todd Hancock of the Sheriff's Department also thought it noteworthy that incidents of vandalism of PG & E property seemed to coincide with Knights' court appearance dates regarding the theft of PG & E services.

More than that, on May 24, 1998, Knights and Simoneau were stopped by a sheriff's deputy near a PG & E gas line. They could not explain their presence in the area to the deputy, who observed that Simoneau's pick-up truck contained pipes, pieces of chain, tools, and gasoline. The deputy asked to search the vehicle, but was refused permission. A few days later, a pipe bomb was detonated against the exterior of a building where a burglary had taken place. That building was not far from Knights' residence.

For our purposes, the final incident occurred on the morning of June 1, 1998. Some miscreant, or miscreants, had managed to knock out telephone service to the Napa County Airport by breaking into a Pacific Bell telecommunications vault and setting fire to it. Brass padlocks which secured the vault and an adjacent PG & E power transformer had been removed, and a gasoline accelerant had been used to ignite the fire. Within a short time after that incident occurred, a sheriff's deputy drove by Knights' residence and observed Simoneau's truck parked in front. The deputy got out of his patrol car and felt the hood of Simoneau's truck. It was still warm at the time, which suggested that Knights and Simoneau might have been involved in the vandalism. The investigation focused even more purposefully upon them as a result.

Thus, on June 3, 1998, Hancock set up surveillance of Knights' apartment. At approximately 1:45 a.m., Knights and Simoneau arrived at the apartment in Simoneau's pick-up truck. The two proceeded to enter the apartment where they remained with the lights on until about 3:10 a.m. At that point, Simoneau emerged from the apartment carrying three cylindrical items cradled in his arms. On the basis of his training, Hancock believed those to be pipe bombs. Simoneau walked to the truck, placed an object shaped like a jar in the back of it, and then walked across the street to the bank of the Napa River, where he disappeared from view. Hancock then heard three splashes as Simoneau, seemingly, deposited those objects in the river. Simoneau returned to the truck without the cylinders, picked up a glass jar from the truck bed and wiped it with a cloth. He then climbed into that truck and departed.

Hancock trailed Simoneau until he stopped in a driveway. When Hancock entered the driveway Simoneau was not around, but Hancock discovered a number of suspicious objects in and about the truck. In the bed of the truck were a Molotov cocktail and explosive materials. Also, a gasoline can and two brass padlocks, which seemed to fit the description given by PG & E investigators of the locks removed from the Pacific Bell and PG & E transformer vault two days earlier, were observed. The truck was seized, impounded, and later searched pursuant to a warrant.

With all of that information in hand, Hancock decided that he would conduct a warrantless "probation" search of Knights' home. As Hancock saw it, he did not need to obtain a warrant because at an earlier time Knights had been placed on summary probation after he was convicted of a state

misdemeanor drug offense. A person on summary probation in California is not under the direct supervision of a probation officer.[1] However, in this case, a term of that probation required Knights to "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." Relying upon that and the authorization of his supervisor, Hancock proceeded.

He began to organize the search at about 5:00 a.m. that morning, and conducted it at 8:00 a.m. after breaking through a door and entering the apartment where Knights was still abed. The search was productive. It turned up detonation cord, ammunition, unidentified liquid chemicals, instruction manuals on chemistry and electrical circuitry, bolt cutters, telephone pole-climbing spurs, drug paraphernalia, photographs and blueprints stolen from the burglarized building, and a brass padlock stamped PG & E. Needless to say, Knights was arrested.

Ultimately, Knights found himself in federal court because he was indicted for conspiracy to commit arson, for possession of an unregistered destructive device, and for being a felon in possession of ammunition. *See* 18 U.S.C. §§ 371, 922(g); 26 U.S.C. § 5861(d). He moved to suppress the evidence seized in the June 3, 1998, search, and the government asserted that it was conducted pursuant to a probation consent. The district court agreed with Knights that the claimed probation search was really a subterfuge for an investigative search and ordered suppression. This appeal followed.

## STANDARD OF REVIEW

A district court's determination of whether there was consent to search is generally treated as a factual determination, but we have said that in "determining whether as a general rule certain types of actions give rise to an inference of consent,

de novo review is appropriate." *United States v. Shaibu,* 920 F.2d 1423, 1425 (9th Cir.1990). The district court's conclusion that the probation search of Knights' apartment was a subterfuge for a criminal investigation is a factual determination which we review for clear error. *See United States v. Watts,* 67 F.3d 790, 793–94 (9th Cir.1995), *rev'd on other grounds,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997).

## DISCUSSION

The difficulties at the interface between a person's right to the security of his home and the needs of law enforcement are sempiternal. Nonetheless, the balance is weighted in favor of the home dweller for reasons with a weighty ancient lineage. Coke's Reports reflect that: "the house of every one is to him as his ... castle and fortress, as well for his defence against injury and violence, as for his repose...." *Semayne's Case* 5 Coke's Rep. 91a, 91b (K.B.1603). That meant not only that a person could defend his home against miscreants, but also that the King's officers were required to give proper notice before entry and had to enter in accordance with the law. *See id.* at 91b–92a. Sir Matthew Hale, who died in 1676, also emphasized that "every man by the law hath a special protection in reference to his house and dwelling." 1 Matthew Hale, Pleas of the Crown 547 (1736). And we read in Wood's Institutes that a sheriff cannot break into a home without first giving proper notice, and signifying the cause. *See* Thomas Wood, An Institute of the Laws of England 71 (1734). More than that, "[i]f a Justice of Peace makes a Warrant upon a bare Surmise, and by Virtue thereof One breaks a House ... It is against Magna Charta." *Id.* at 615. Finally, as Blackstone said: "the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity; agreeing herein

---

1. *See People v. Soto,* 166 Cal.App.3d 770, 774 n. 3, 212 Cal.Rptr. 696, 699 n. 3 (1985).

with the sentiments of antient Rome. . . ." 4 William Blackstone, Commentaries *223 (1765).

But venerable as they are, we need not depend solely on the words of English judges and lawyers for our protections. The Fourth Amendment carried forward and burnished the principles upon which they relied when it commanded that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated. . . ." As Justice Story has told us, that amendment "seems indispensable to the full enjoyment of the rights of personal security, personal liberty, and private property. It is little more than the affirmance of a great constitutional doctrine of the common law." *See* Joseph Story, Commentaries on The Constitution of the United States, § 1902 (2nd ed. 1851). That was echoed and elaborated upon by the redoubtable Thomas M. Cooley, who wrote: "[E]very man's house is his castle. The meaning of this is that every man under the protection of the laws may close the door of his habitation, and defend his privacy in it, not against private individuals merely, but against the officers of the law and the state itself." Thomas M. Cooley, The General Principles of Constitutional Law 218 (1891). We have often said much the same thing. *See, e.g., United States v. Becker*, 23 F.3d 1537, 1539–40 (9th Cir.1994); *see also Wilson v. Layne*, 526 U.S. 603, 609–13, 119 S.Ct. 1692, 1697–98, 143 L.Ed.2d 818 (1999).

▪ Of course, there can be no doubt that a person can consent to a search of his home, although we carefully scrutinize claims that he has done so. *See Shaibu*, 920 F.2d at 1425–26. There also can be little doubt that Knights did consent to

searches when he agreed to the terms of his probation.[2] But we have made it clear that his consent must be seen as limited to probation searches, and must stop short of investigation searches. We simply have refused to recognize the viability of a more expansive probationary consent to search term. That was illustrated in 1985, when we were faced with a California probationer who had not had supervision services commenced and at whose home a supposed probation search was conducted. *See Merchant*, 760 F.2d at 965. We had this to say after we reviewed the record:

> The facts show that none of the law enforcement officers reasonably could have believed that the search related to the interests of effective probation supervision. There is no showing that the state ever made any efforts toward rehabilitating Merchant. He did not receive supervision or counseling. In fact, he was never even assigned a probation officer.

> The search was conducted because the assistant district attorney had received reports of gunfire on Merchant's property. . . .

> These facts strongly suggest that the search was a subterfuge for conducting a criminal investigation. We have condemned the practice of using a search condition imposed on a probationer as a broad tool for law enforcement. Because the search here clearly was not a genuine attempt to enforce probation but apparently had a motive of avoidance of Fourth Amendment requirements, it is the type of law enforcement conduct that ought to be deterred. Con-

**2.** The government suggests that we have never explicitly said that a probationer has consented to a search term. But we have, in effect, deemed that the search term is consented to—accepted—by the probationer when he is placed upon probation, and we have not questioned the binding effect of that consent. So, we have stated that a defendant's probation was "conditioned . . . on his consent" to a search term. *United States v. Merchant*, 760 F.2d 963, 964 (9th Cir.1985). We have also described the limits of a probation search term to which, as the government there argued, the defendant had "consented" as a "condition of his probation." *United States v. Ooley*, 116 F.3d 370, 371 (9th Cir. 1997).

sequently, the exclusive rule applies with full force.

*Id.* at 969 (citations omitted).

That was not an unusual holding. Rather, it was one of a long line of cases. So, over ten years later we dealt with the same sort of situation. *See Ooley,* 116 F.3d at 372. There, too, a California probationer, with a consent to search term like the one in this case, claimed that a search by state law enforcement officers was merely a subterfuge. *Id.* at 372. We said, "[w]ith respect to probationers, we have long recognized that the legality of a warrantless search depends upon a showing that the search was a true probation search and not an investigation search." *Id.* And, we added, "[u]nlike an investigation search, a probation search should advance the goals of probation, the overriding aim of which 'is to give the [probationer] a chance to further and to demonstrate his rehabilitation while serving a part of his sentence outside the prison walls.'" *Id.* (citation omitted); *see also United States v. Johnson,* 722 F.2d 525, 527–28 (9th Cir.1983); *United States v. Consuelo–Gonzalez,* 521 F.2d 259, 266–67 (9th Cir.1975) (en banc); *cf. Smith v. Rhay,* 419 F.2d 160, 162–63 (9th Cir.1969) (parole term).

Here, the district court's determination that the purpose of the Sheriff's Department was the investigation of Knights and the termination of his nefarious career, rather than a probation search, was not clearly erroneous. Indeed, it was an almost ineluctable conclusion. Detective Hancock, and his cohorts, were not a bit interested in Knights' rehabilitation. They were interested in investigating and ending the string of crimes of which Knights was thought to be the perpetrator. That string began long before his summary probation started. In fact, his probation started just three days before the last incident. True, a probation officer may also wish to end wrongdoing by a probationer, but there was no "also" about Detective Hancock's purpose. He was performing his duty as a law enforcement officer and had drawn some very good inferences from the facts, but he was using the probation term as a subterfuge to enable him to search Knights' home without a warrant. In so doing, he crossed the frontier that separates citizen privacy from official enthusiasm. The subterfuge will not work. That would seem to bring this opinion to a logical close, but we must pause to consider a number of arguments against this result.

The government first asserts that the Supreme Court severely undercut our probation search jurisprudence when it issued *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In fact, says the government, our jurisprudence is so weakened that this panel should give it the slight tap that will send it crashing to the ground. We will not do that for at least two reasons beyond pure principle. In the first place, we have reiterated our rule since *Whren* was decided. *See Ooley,* 116 F.3d at 372. Secondly, the government's argument turns on the notion that the subjective purposes of the officers should not be considered if, objectively, a probation officer could have conducted a probation search. That argument is based upon the holding of *Whren* that the reasonableness of traffic stops with probable cause does not depend upon the subjective intentions of the officers. *See Whren,* 517 U.S. at 813, 116 S.Ct. at 1774. That form of argument is far off target when applied in the context at hand. Here the issue is not whether a search or seizure with probable cause should be invalidated because of an officer's subjective intentions. It is, rather, whether, without another basis for a warrantless home search, there was consent to the search in the first place. That is a different question entirely. It depends on whether the consent covers what the officer did. *See United States v. Woodrum,* 202 F.3d 1, 12–13 (1st Cir.), *petition for cert. filed,* 69 U.S.L.W. 3087 (U.S. June 22, 2000) (No. 00–60). We recognize that the California Supreme Court disagrees with our *Whren* analysis. *See People v. Woods,* 21 Cal.4th 668, 677–81, 981 P.2d 1019, 1025–27, 88 Cal.Rptr.2d 88,

94–97 (1999). But, then, that court does not control our reading of federal constitutional law, and for the reasons already stated, we find its analysis unpersuasive.[3] However, mention of that case does lead to another of the government's arguments.

 The government asserts that in order to avoid confusing state law enforcement officers we should accept the fruits of their search, even if we think that the search was unconstitutional under the United States Constitution. We think not. While state court rulings, especially on questions of state law, may be of interest, they do not determine the legality of a search for Fourth Amendment purposes. See Ooley, 116 F.3d at 372. Application of the exclusionary rule regarding searches does not ordinarily turn on state law, even if the state courts would take a more stringent view. See United States v. Cormier, 220 F.3d 1103 (9th Cir.2000); United States v. Mota, 982 F.2d 1384, 1387 (9th Cir.1993); see also id. at 1389 (Fernandez, J., concurring). More to the purpose, accepting the government's argument would amount to the recrudescence of the silver platter doctrine. But that platter was melted down by the Supreme Court in Elkins v. United States, 364 U.S. 206, 208, 80 S.Ct. 1437, 1439, 4 L.Ed.2d 1669 (1960), where the Court rejected the idea that the fruits of a search by state officers which would be unconstitutional if conducted by federal officers could be introduced in a federal criminal trial. We will not refabricate that platter.

 The government passingly makes the argument that the officers relied in good faith on California law, and, therefore, suppression should not follow. We have previously rejected just that kind of argument in this context. See Merchant, 760 F.2d at 968–69. At any rate, the officers were not trapped into relying on some state law or ordinance which was later found to be unconstitutional. See Illinois v. Krull, 480 U.S. 340, 349–50, 107 S.Ct. 1160, 1167, 94 L.Ed.2d 364 (1987); cf. Grossman v. City of Portland, 33 F.3d 1200, 1209–10 (9th Cir.1994). For at least three decades, it has been the law of this circuit that subterfuge probation searches are unconstitutional. Perhaps the California courts will admit the fruits of the search of Knights' residence; we will not.

 Finally, argues the government, the purposes of a probation search were served because Knights was supposed to "obey all laws," was deterred by the search from being a threat to the community, and was further deterred from engaging in further criminal activity. No doubt a true probation search can serve those ends. Then, too, so does an investigative search. In fine, with its aduncous argument the government hopes to indirectly eliminate our cases which rely on the difference between probation and investigation searches. It cannot.[4]

## CONCLUSION

As we enter the 21st Century, citizens find the very notion of privacy under almost relentless assault. Random suspiciousness taking and testing of body fluids proliferates on ever more flimsy grounds; motor vehicle departments sell information about those who are forced to give it in order to obtain driver's licenses; banks use private account information for other purposes and provide it to other related entities; when a consumer visits a website, a spy is placed in his computer; it has become easier to invade homes without knocking and giving notice; and on and on. In this climate, it is easy to develop callouses on our sense of privacy. Perhaps it even seems quaint to worry much about

---

3. We note that three of the court's seven justices were of the same mind and vigorously dissented. See Woods, 21 Cal.4th at 682, 981 P.2d at 1028, 88 Cal.Rptr.2d at 98 (Kennard, J., dissenting); id. at 683, 981 P.2d at 1029, 88 Cal.Rptr.2d at 98 (Brown, J., dissenting).

4. The government also suggests that because it could have obtained a warrant, it did not have to do so. To state that proposition is to refute it. See United States v. Mejia, 69 F.3d 309, 319–20 (9th Cir.1995).

the sanctity of a home where we can speak, listen, read, write and think in privacy. Perhaps it seems even more quaint to worry about "[a] probationer's home [which], like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.' " *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987). But worry we must, and do.

We now reiterate our insistence that even when a probationer has consented to searches of his home as a condition of his probation, those searches must be conducted for probation purposes and not as a mere subterfuge for the pursuit of criminal investigations. In making this decision we need not rely on some resident numen or wait for Fulgora to light our way. We can, instead, rely upon the wisdom of the ages and upon the sagacity of the numerous Ninth Circuit judges who have written before us. If we do not heed all of that history and learning, who will?

AFFIRMED.