IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 10, 2026 Session

## STATE OF TENNESSEE v. JAY BURROUGHS CHANDLER

**Appeal from the Criminal Court for Sumner County**
**No. 2023-CR-17      Dee David Gay, Judge**

_____

### No. M2025-00381-CCA-R3-CD

_____

The Defendant in this case, Jay Burroughs Chandler, was charged with fifty-four counts of violating Tennessee Code Annotated section 39-17-1003 by possessing material depicting a minor child engaged in sexual activity.  Prior to trial, the Defendant filed two motions to suppress, both of which the trial court denied.  After a bench trial, the Defendant was convicted as charged.  The trial court subsequently imposed an effective sentence of one hundred years in prison.  In this direct appeal, the Defendant contends that the trial court erred in denying both of his motions to suppress and in sentencing him.  We affirm the Defendant's convictions.  We vacate the Defendant's sentence and remand this matter for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; and Remanded for Resentencing**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., joined.  MATTHEW J. WILSON, J., filed a concurring opinion.

Patrick T. McNally (on appeal), Nashville, Tennessee; John D. Pellegrin and Bernard F. McEnvoy (at trial), Nashville, Tennessee, for the appellant, Jay Burroughs Chandler.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Thomas Dean, District Attorney General; and Nathan Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual Background

In October 2022, the Defendant was observed having sex with a minor female ("the Minor") and recording the activity on his cell phone. The observer notified the Minor's mother, and mother and daughter reported the Defendant's actions to the police. As a result of this report, Detective Javier Garcia of the Hendersonville Police Department drove to the Texas Roadhouse where the Defendant worked as a kitchen manager. Detective Garcia arrested the Defendant at the restaurant, and the Defendant was then transported to the police department.

In conjunction with taking the Defendant into custody, Detective Garcia asked the Defendant for his cell phone ("the Phone"). The Defendant initially said that the Phone was at his home but then said it was in his vehicle. The Defendant did not consent to a search of his car, so Detective Garcia obtained a search warrant to search the Defendant's vehicle.

Detective Garcia began searching the Defendant's vehicle which was parked near the restaurant. Detective Chambers assisted him. While Detective Garcia was looking in the vehicle's trunk, and without Detective Garcia's knowledge, Detective Chambers approached Amber Kelso, one of the restaurant's employees, who was standing outside the restaurant smoking a cigarette.

Detective Chambers and Ms. Kelso had a brief conversation, after which Ms. Kelso entered the restaurant, and returned with the Phone, which she handed over to Detective Chambers. The Phone was subsequently determined to contain material depicting minors engaged in sexual activity. An ensuing search of the Defendant's home resulted in the recovery of multiple electronic devices containing additional illegal images.

On the basis of the images found on the devices recovered from the Defendant's home, the Defendant was charged with fifty-four counts of violating Tennessee Code Annotated section 39-17-1003 by possessing material depicting a minor child engaged in sexual activity.

Prior to his trial, the Defendant filed a motion to suppress the evidence recovered from the Phone as well as evidence later obtained based on information recovered from the Phone. The Defendant also filed a motion to suppress the evidence recovered from his home. The trial court denied both of these motions, and the matter proceeded to a bench trial. Upon the conclusion of the trial, the trial court convicted the Defendant of all charges. The trial court subsequently sentenced the Defendant to an effective term of one hundred years of imprisonment.

In this direct appeal, the Defendant challenges the trial court's rulings on his motions to suppress as well as his sentence.

## Motions to Suppress

A.  Motion to Suppress Phone.  At the hearing on the Defendant's motion to suppress the evidence found on the Phone (and the evidence later obtained pursuant to a search warrant based on evidence recovered from the Phone), Detective Garcia testified that he interviewed the Minor about her relationship with the Defendant.  The Minor confirmed that she had been having sex with the Defendant, who was her supervisor at the Texas Roadhouse restaurant.  Upon looking at her phone, Detective Garcia found text messages between the Minor and the Defendant.  Detective Garcia testified that most of these text messages "were about sex and the relationship between both of them."  He also found a video of a male masturbating.  This male had a tattoo on his leg that matched a description of a tattoo on the Defendant's leg.  Detective Garcia testified that the Minor was sixteen years old, and that the Defendant was thirty-nine years old.

Detective Garcia obtained an arrest warrant for the Defendant and located him at the Texas Roadhouse.  After advising the Defendant of his Miranda rights and explaining the allegations against him, the Defendant stated, "I don't want to talk anymore." Detective Garcia took the Defendant into custody.

Detective Garcia testified that he asked the Defendant for his phone, "and [the Defendant] said – at first he said it was at his house.  And I said your house?  He said, well, it's in my car."  When Detective Garcia asked the Defendant for consent to retrieve his phone from his car, the Defendant refused.  The Defendant was then transported "to the jail."

Detective Garcia obtained a search warrant for the car.  The warrant was signed at approximately 9:30 that evening.  Detective Garcia returned to the car's location and began searching for the Phone.  Detective Chambers was with him.  While Detective Garcia was trying to find the Phone in the car, and unbeknownst to him, Detective Chambers walked to the restaurant.  A few minutes later, Detective Chambers returned with the Phone. Detective Garcia testified that he was "surprise[d]" by this.

Detective Garcia queried Detective Chambers about how he came to have the Phone.  Detective Chambers told him that he had spoken with Ms. Kelso, asking her if the Defendant had left any property in the restaurant.  Ms. Kelso entered the restaurant and returned with the Phone, handing it over to Detective Chambers.

Detective Garcia then requested to see the location from which the Phone had been retrieved.  He testified:

- 3 -

> I walked inside. There was an office, like – it was sort of a modest office. But while I was there a bunch of employees walked in and out of the office. There was like this clear bin with drawers. They were all clear. One of the drawers had his [the Defendant's] name. She [Ms. Kelso] said that the phone was in there – his name and somebody else's name.

Detective Garcia took photographs of the bin in which the Phone had been found, and they were admitted into evidence.

Detective Garcia took the Phone to the police department and obtained a search warrant "for [a] download of the phone." The resulting download revealed "the video of [the Defendant] having sex with a 16-year-old female. Also, there was found pictures and videos of juveniles, five, six years old having sex with adults." Detective Garcia then obtained a second search warrant for "a more in-depth search" of the Phone. When this second search of the Phone revealed more illegal images, the police obtained a search warrant for the Defendant's home. There, police officers recovered "multiple cell phones, hard drives, [and] computers in his bedroom." Subsequent search warrants were obtained for these devices, and on them were found "[t]housands of pictures and videos of child[ren] having sex and being naked and stuff like that." One video led to the Defendant being charged with rape of a child. The Defendant was also charged with statutory rape by an authority figure for his encounter with the Minor.

Detective Garcia testified that if he had not recovered the Phone on the night of the Defendant's arrest, he would have sought a search warrant for the Defendant's house based on the Defendant's initial statement that the Phone was there. That search would have revealed the other phones eventually recovered from the house.

On cross-examination, Detective Garcia confirmed that he was the detective in charge of this matter. He acknowledged that while he was unsuccessfully searching the Defendant's car for the Phone, he did not tell Detective Chambers to check whether the Phone was in the Texas Roadhouse restaurant. Because he was searching in the trunk, he did not see Detective Chambers head off toward the restaurant. Detective Chambers did not inform him that he was going to the restaurant.

Before Detective Garcia realized that Detective Chambers had left, he returned holding the Phone. It was not packaged in any way. Detective Chambers told Detective Garcia, "this is the phone; it was inside the restaurant." Detective Garcia acknowledged that he was "concerned" about Detective Chambers' retrieval of the Phone. He questioned Detective Chambers about how he found the Phone, and Detective Chambers told him that he had spoken with a Ms. Kelso. Detective Chambers told Detective Garcia that he had

asked Ms. Kelso if the Defendant had any property in the restaurant. Ms. Kelso then went into the restaurant and returned with the Phone.

At that point, Detective Garcia determined he wanted to see the location in the restaurant from where the Phone was recovered. He walked into the front of the restaurant and asked for Ms. Kelso. She responded, and he asked her to show him where the Phone had been found. She walked him through a door into the kitchen, an employee-only area, and through another door at the rear of the kitchen. They then walked through another door into the manager's office. The door into the manager's office was closed. In the manager's office were two or three desks, desktop computers, and a plastic storage cabinet holding six drawers. Detective Garcia learned that the Phone had been retrieved from inside one of the drawers.

As reflected below, the two photographs of the receptacle from which the Phone was retrieved show two plastic storage bins, each with three drawers, pushed up against one another to create a total storage area of six drawers. The bins are sitting on a shelving unit above a desk. The plastic frames that hold the drawers are an opaque white. The drawers themselves are semi-transparent. All of the drawers are closed. No locking mechanism is apparent. Each drawer is labeled with at least one name. One of the drawers is labeled with the name "JAY." This drawer also bears a label stating, "NO KEYS ALLIE!" The drawers also bear "stickers" across their fronts. Paperwork is sticking out of three of the drawers. It is possible to see the shapes of some objects that are at the very front of the drawers. It is not possible to see the entire contents of any drawer just by looking at the bins.

 

Vol. 9, Ex. 1 and 2.

Detective Garcia agreed with defense counsel that "the better practice" for Detective Chambers' retrieval of the Phone "would have been to freeze the scene, have Detective Chambers sit there, send everybody else out, and then get a search warrant." Detective Garcia also acknowledged that his intent in obtaining the Phone was to search for proof relevant to the Defendant's sexual relations with the Minor. Detective Garcia acknowledged that, after subsequently obtaining a search warrant for the Phone, he found child pornography videos on it and used that information to establish probable cause for a warrant to search the Defendant's home. That warrant was intended to gather evidence relevant to the sexual exploitation of minors.

Detective Garcia claimed that although the Defendant was in custody, "somebody else" could have altered or deleted information on the Phone. Detective Garcia had no personal experience with such remote deletions, but he stated that he had "read cases about it."

On redirect, Detective Garcia stated that the Phone was not "pinged" in order to determine its location. He was aware that Ms. Kelso had stated that Detective Chambers told her that the Phone had been pinged, indicating its location in or near the restaurant. Detective Garcia testified that Detective Chambers told him that he had not told Ms. Kelso that the Phone had been pinged.

Detective Lee Chambers testified that, while he was assisting Detective Garcia search the Defendant's car, he saw two employees standing outside the Texas Roadhouse's back door. He walked up to them and spoke with Amber Kelso, "who [he] believed to be the manager." He told Ms. Kelso that they were there to get the Defendant's phone. He testified, "I asked her if it was possible that he had left his phone on a back table or a back desk or something like that." At that, Ms. Kelso went inside the restaurant and returned with the Phone. Detective Chambers stated that he did not go in the restaurant with her.

Once Ms. Kelso gave him the Phone, he turned it over to Detective Garcia. Detective Chambers testified that he did "not recall" telling Ms. Kelso that they had pinged the Phone to determine its location.

On cross-examination, Detective Chambers acknowledged that the supplemental report he wrote concerning his interaction with Ms. Kelso stated that he had "asked her to check and see if [the Defendant] left [his cell phone] inside of the business." He acknowledged that he did not accompany Ms. Kelso into the restaurant in order to stop her from looking into closed containers but stated that he "wouldn't want her to go into anything like that, like a locker or something like that." He explained that, based on his prior experience working at a Captain D's and a "smaller mom-and-pop type restaurant,"

- 6 -

if the Defendant had left his phone in the restaurant, he would have left it "setting around, it would be setting on a desk or on a back prep table or something like that."

Ms. Amber Kelso testified that, at the time of these events, she was employed at the Texas Roadhouse as the administrative assistant. She was on the management team but did not supervise employees. She was in charge of payroll compliance, audit compliance, and accounts receivable. She performed her duties in the restaurant's office, which she described as being in the back of the restaurant and not open to the public. She stated that the Defendant was the kitchen manager. He used the office to do inventory and scheduling. Ms. Kelso testified that the plastic storage cabinet in the office was for the management team. She referred to the cabinet as "boxes."

On the night in question, she was on the back patio of the restaurant when Detective Chambers approached her. She testified,

> So once I was approached, he just had mentioned that the phone was pinging to that location and asked if there was somewhere else in the building that the phone may be, at which point I told him it could be in the office. I went to the office. The phone was in the box. I returned the phone to him.

On cross-examination, Ms. Kelso testified that the office door "should have been locked." She explained that each of the "boxes" in the plastic storage cabinet was assigned to someone on the management team. One of the boxes belonged to her. Other people could access her box to put mail or other business paperwork in it. However, servers, hostesses, and busboys "should not be looking through those bins." Anyone who was looking into the boxes inappropriately could be disciplined. She agreed with defense counsel's statement that "the managers who have those six storage bins should be able to rely on them, that they're secure, and that no one is going to take their property." She also stated that the "boxes" were "there for paperwork, essentially." She would open them to deliver mail or retrieve a business-related item necessary for her job.

Ms. Kelso testified that she was "certain" that Detective Chambers told her that the Phone was pinging to their location. She agreed that the reason she retrieved the Phone was because she had been asked to do so by a police officer. She stated that "no keys Allie" was not a nickname for the woman to whom it referred.

On redirect, Ms. Kelso testified that the drawers "should be private" and that they were private to the management team. She also stated that their primary purpose was Texas Roadhouse business.

In ruling on the motion to suppress after hearing this proof, the trial court first determined that the Defendant had a reasonable expectation of privacy in the drawer in which the Phone was found. The trial court next determined that, based on Detective Chambers' statements to her, Ms. Kelso acted as an agent for the State when she retrieved the Phone. The trial court next found that Ms. Kelso had both "apparent authority" and "common authority" to consent to the search. Moreover, the trial court concluded that exigent circumstances justified the warrantless search:

> [The Phone] wasn't in his car because he lied. Now, if he's bold enough and perverted enough to have sex with an underage girl that he works with in her own house in her bedroom when her mother is sleeping, and videoing the encounter, I think that he would be bold enough to try to do anything, because he's already lied, to destroy the evidence of his perversion after he's caught and arrested.
>
> . . . .
>
> Now, the defendant had already lied and sent the officers on a two-an-a-half hour wild goose chase. In my opinion he's not beyond doing anything that he can to locate somebody [another worker at the restaurant] and tell them please go into that office and get my phone. That is not beyond belief. That is not beyond probability. There is an extremely good likelihood knowing the defendant, his character, and what he had done and how he had lied and how much that evidence was valuable to him. So I believe there is a good case for exigent circumstances to apply in this particular case.

Accordingly, the trial court refused to suppress the evidence recovered in conjunction with the Phone.

B. **Motion to Suppress Evidence Recovered from Defendant's Home.** The Defendant's second motion to suppress contended that the affidavit in support of the search warrant for the Defendant's home failed to establish probable cause. This motion was decided on the basis of the parties' pleadings and arguments.

In his motion, the Defendant explained that the police sought a search warrant for his home after discovering "multiple pornographic videos of young females" on the Phone. Prepared by Detective Landon Brisco of the Hendersonville Police Department, the affidavit in support of the warrant provided as follows:

STATEMENT OF FACTS IN SUPPORT OF PROBABLE CAUSE

On 10/25/2022, [the Defendant] (07/25/1983) was observed at 245 Indian Lake Blvd, Hendersonville, Sumner County, Tennessee having sex with and taking a video of a female that was later identified as being a 16-year-old juvenile.

On 10/25/2022, [the Defendant] was arrested for the offense of Aggravated Statutory Rape.

[The Defendant's] mobile device was seized, and a forensic examination was conducted on the device.

After reviewing the contents of [the Defendant's] device, there were multiple videos of child sexual exploitation material observed by Detective Garcia.

Detective Garcia described the child exploitation material as being children other than [the Defendant's] children.

On 10/28/2022, [the Defendant] was arrested at 111 Devonshire Trail, Hendersonville, Sumner County, Tennessee for possession of child sexual exploitation material and the residence was identified as being his.

Through experience and training this Affiant has learned that the following characteristics are generally found to exist in varying combinations and be true in cases involving people who buy, produce, trade, or sell child sexual exploitation material and who molest children. The subjects receive sexual gratification from actual physical contact with children and from fantasy involving use of pictures or other art mediums and writings on or about sexual activity with children. These people collect sexually explicit materials depicting children. These people rarely, if ever, dispose of this sexually explicit material. The people often correspond or meet with one other [sic] to share information about their victims including personal information to create a trust network with other subjects involved in these similar activities so exchange for additional material and information is available. These subjects rarely, if ever, dispose of the correspondence. These subjects are also likely to keep records of their victims and diaries of their encounters.

The affidavit also included information about Detective Brisco's law enforcement experience and training.

The Defendant contended in his motion that this affidavit failed to

provide the issuing judge with <u>any</u> information as to the content of the videos. As a result, the issuing judge [was] not in a position to make an independent, impartial and detached determination as to whether the videos are in fact illegal, and whether a search of [the Defendant's] home is likely to uncover additional evidence of sexual exploitation of a minor.

The Defendant also argued at the hearing on this motion that the affidavit contained no information about who had reportedly observed the Defendant having sex with the Minor and recording the encounter on his cell phone; that the averment that the Defendant resided at the address provided in the affidavit was inadequately supported by any facts; and that the affidavit provided no basis for concluding that evidence of criminal activity would be found at the listed residence. Based on these deficiencies, the Defendant argued that the search warrant was defective and that the evidence obtained pursuant thereto should be suppressed.

The State responded that, by initially stating that the Defendant had been observed filming himself having sex with an underage female, the affidavit "clearly set forth the content of child sexual exploitation material at issue." Moreover, the fact that the Defendant was subsequently arrested for statutory rape demonstrated that the initial statement of fact was accurate. The State further contended that, even if the trial court deemed the search warrant defective, the evidence recovered should nevertheless be deemed admissible pursuant to a good-faith exception.

The trial court denied the Defendant's second motion to suppress, ruling that the statement of facts in support of probable cause was sufficient.

### **Bench Trial and Sentencing**

At the Defendant's bench trial, the parties entered several stipulations, including the identification of numerous electronic devices seized from the Defendant's home, including one Galaxy S8 cell phone, one Galaxy SM-G900P cell phone, a laptop computer, and two hard drives (collectively, "the Devices"); that the Devices contained "still images and/or video recordings depicting persons under the age of eighteen (18) years of age (hereinafter 'minor') engaged in sexual activity as that term is defined within Tenn. Code Ann. § 39-17-1002(8)"; that the Devices contained a sufficient number of such images and/or video recordings to meet all 54 counts of the indictment; and that the Defendant reserved all rights to challenge the searches undertaken by the police and the evidence obtained pursuant thereto. We note that the Phone was not included in the Devices.

In addition to the stipulations, the trial court considered testimony offered by Detective Brisco. In addition to obtaining the search warrant for the Defendant's home, he

- 10 -

participated in the search that recovered the Devices. He then obtained a search warrant for the Devices themselves and extracted the information contained on the Devices. On cross-examination, Detective Brisco acknowledged that the search warrant for the Defendant's home was based in part on contents found on the Phone recovered at the Texas Roadhouse.

Detective Sergeant Christopher Gagnon of the Hendersonville Police Department also testified. He conducted an examination of the content recovered from the Devices and prepared a report reflecting his findings. The report was admitted into evidence.

The trial court reviewed a limited number of the images recovered from the Devices. The defense presented no testimony. The trial court found the Defendant guilty as charged.

At the subsequent sentencing hearing, Detective Brisco testified about photographs found on the Devices that showed the Defendant engaging in the sexual abuse of his minor stepdaughter. These photographs led to a separate prosecution against the Defendant. The State also introduced evidence of the Defendant's several prior misdemeanor convictions. The presentence report was also admitted into evidence. It included a STRONG-R needs and risks assessment report indicating that the Defendant's risk of re-offending was "moderate."

In imposing sentence, the trial court first noted that the Defendant was a Range I offender. The sentencing range for his convictions on counts one through twenty-five was eight to twelve years. The sentencing range for his convictions on counts twenty-six through fifty-four was two to four years. As to enhancement factors, the trial court found that the Defendant had a previous history of convictions or criminal behavior in addition to those required to establish the appropriate range and that, based on the number of images involved in the instant case as well as prior criminal activity disclosed by the Defendant in his presentence report, the Defendant was "an offender whose record of criminal activity is extensive." The trial court also found that "many victims in this case . . . were vulnerable because of age" and that the offenses were "to gratify the defendant's desire for pleasure or excitement." The trial court applied no mitigating factors. The trial court criticized the STRONG-R report as "incredible" and "ridiculous" because it concluded that the Defendant's risk level for re-offending was "moderate." The trial court then sentenced the Defendant to the maximum term of twelve years for each of the first twenty-five convictions and to the maximum term of four years for each of the remaining twenty-nine convictions. The court ran some of the terms consecutively thereby imposing an effective term of one hundred years in prison with no release eligibility.[1]

---

[1] Although the trial court announced a total effective sentence of one hundred years at the sentencing hearing, the judgment forms reflect a total effective sentence of one hundred and four years. On

In conjunction with issuing its sentence, the trial court stated the following:

> [T]his is what our law states in 40-35-102:  The foremost purpose of this chapter is to promote justice.
>
> *Justice is a priority of God*, and justice is a priority of this country.  Justice.  You look at a reliable standard.  In this particular case it's the rule of law and you apply the rule of law.  And in justice there is punishment.
>
> . . . .
>
> We've got an individual here who was looking at these videos, having sexual relations with children, and I don't think we should ever, ever forget that these people, when they look at them and they pass them on, like the defendant, they're endorsing – they are endorsing criminal, perverted, *paganistic*[2] conduct.  And every time that picture is shown, and forever, as long as that photograph is not destroyed or deleted, we're damaging a child, a human being.  *In Deuteronomy it tells us to choose life.*
>
> . . . .

---

remand, the trial court will take care to ensure that the judgment forms accurately reflect the sentence imposed.

[2] The website Brittanica.com defines paganism as a

> Christian term used to designate those religions that do not worship the God of Abraham, the figure central to both Christianity and to other Abrahamic religions like Judaism and Islam.  Christians have used the terms *paganism* and *pagan*, which typically carry pejorative connotations, to draw clear distinctions between themselves and those who they believe are worshipping false gods.
>
> . . . .
>
> These terms [*paganism* and *pagan*] can still be found in use among certain Christian groups that have little desire for cordial relationships with non-Abrahamic religions.

https://www.brittanica.com/topic/paganism.  The trial court also described the offense of sexual exploitation of a minor as involving "paganism" in State v. Richmond, No. M2021-01025-CCA-R3-CD, 2022 WL 4372220, at *9 (Tenn. Crim. App. Sept. 22, 2022).  The trial judge should not use the bench to cast negative aspersions on any religion.

And to have sex with a minor that works for you in a room where you can see what's going on from the outside and videoing it while it's going on, there is a lack of conscience, *a lack of any kind of accountability to good and evil* that can't be explained.

(emphases added).

In this appeal, the Defendant contends that the trial court abused its discretion while imposing sentence and that his sentence is excessive.

## ANALYSIS

I. <u>First Motion to Suppress.</u>  As set forth above, the Phone was recovered pursuant to a warrantless search of a plastic drawer located in a shared office that the Defendant occasionally used at his place of employment ("the Drawer").  The search was conducted by Ms. Kelso at the behest of Detective Chambers.  The Defendant contends that this search was unconstitutional.

When evaluating a trial court's ruling on a motion to suppress, this court may consider the proof presented at both the suppression hearing and at trial.  <u>See</u> <u>State v. Williamson</u>, 368 S.W.3d 468, 473 (Tenn. 2012) (citing <u>State v. Henning</u>, 975 S.W.2d 290, 297-99 (Tenn. 1998)).  "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise."  <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996).  The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.  So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

<u>Id.</u> at 23.  However, this court's review of a trial court's application of the law to the facts is de novo.  <u>See</u> <u>State v. Day</u>, 263 S.W.3d 891, 900 (Tenn. 2008) (citing <u>State v. Williams</u>, 185 S.W.3d 311, 315 (Tenn. 2006); <u>State v. Yeargan</u>, 958 S.W.2d 626, 629 (Tenn. 1997)).

A.    The Fourth Amendment to the United States Constitution prohibits the government from conducting "unreasonable searches and seizures."  U.S. Const. amend. IV.  "Article I, § 7 of the Tennessee Constitution similarly prohibits unreasonable searches and seizures and is identical in intent and purpose with the Fourth Amendment."  <u>State v.</u>

Troxell, 78 S.W.3d 866, 870 (Tenn. 2002). The purpose of these prohibitions is to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Yeargan, 958 S.W.2d at 629 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). "[T]he general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010). The burden is on the State to demonstrate that the warrantless search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. See State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000).

Neither the federal nor the Tennessee constitutional provision is offended when searches are conducted by private citizens for non-governmental purposes. See State v. Sanders, 452 S.W.3d 300, 307 (Tenn. 2014) (recognizing that "the constitutional protection against unreasonable searches and seizures does not apply to 'a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'") (quoting United States v. Jacobsen, 466 U.S. 109, 115 (1984)). In this case, there is no dispute that the search at issue was conducted by Ms. Kelso, an employee of the Texas Roadhouse and not formally affiliated with any government agency. Thus, we first address the status that Ms. Kelso held at the time she searched for and recovered the Phone from the Drawer.

The Tennessee Supreme Court has recognized a two-pronged test used to determine whether a private citizen is acting as an agent or instrument of the government when conducting a search, thereby triggering Fourth Amendment protections. See State v. Burroughs, 926 S.W.2d 243, 245-46 (Tenn. 1996) (citing United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981)). The first prong of this test considers "'the government's knowledge and acquiescence.'" Id. at 246. The second prong considers "the intent of the party performing the search.'" Id. Both prongs must be satisfied to support the conclusion that a private party acted as an agent of the government. Id. Thus, "[a] private party acting for a reason independent of a governmental purpose does not implicate the Fourth Amendment." State v. Cowan, 46 S.W.3d 227, 232 (Tenn. Crim. App. 2000) (citing Burroughs, 926 S.W.2d at 246).

At the hearing on the motion to suppress, the trial court agreed with the Defendant that Ms. Kelso was acting as a state agent when she conducted her search for the Phone. We affirm this ruling by the trial court. The proof at the hearing established that Ms. Kelso conducted her search solely because she was asked to do so by Detective Chambers. Ms. Kelso thereby became an agent of the State and was subject to the same constitutional limitations upon her search as Detective Chambers would have been had he conducted the search himself.

- 14 -

Despite its ruling that Ms. Kelso acted as a state agent, the trial court also ruled that Ms. Kelso had given third-party consent to the search. In this ruling, the trial court erred. One cannot simultaneously act as a state agent and as an independent third party capable of giving consent.

B. Having made the threshold determination that the search of the Drawer was conducted by a state agent and therefore subject to constitutional limitations, we turn now to the issue of whether the Defendant himself had a sufficient privacy interest in the Drawer to be able to claim Fourth Amendment protections.

As the Tennessee Supreme Court has made clear, one may claim the protections of the Fourth Amendment and comparable Tennessee constitutional provision only after establishing that he or she had a reasonable expectation of privacy in the place searched. Talley, 307 S.W.3d at 730 (citing Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). This inquiry involves two distinct questions: "'(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances.'" Id. (quoting State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001)). Factors relevant to this determination include the following:

> (1) [whether the defendant owns the property seized]; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has the right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

State v. Ross, 49 S.W.3d 833, 841 (Tenn. 2001) (citing State v. Turnbill, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982) (alteration in Ross).

At the hearing on the motion to suppress, the trial court ruled that the Defendant had a reasonable expectation of privacy in the Drawer, stating,

> Now, the record shows that . . . the restaurant had this small office for office work; it was not locked. It had plastic with – bins that you could see through. There were shelves there and they could be pulled out easily and nothing that was locked, easy to put things in to store and shut. The defendant's name was on the shelf, and that's where he put his stuff and he

put his phone. His phone was in there. Nothing else when in there except business documents placed by others and Ms. Kelso.

All this leads me to the conclusion that he had a legitimate expectation of privacy and standing. So with the fact his name was there, his phone was there, he had access as others, I find that he had standing or a legitimate expectation of privacy.

The State contends that the trial court erred in this ruling, arguing that the Defendant failed to establish a legitimate expectation of privacy.

We begin our analysis by recognizing that "[i]t has long been settled that one has standing to object to a search of his office, as well as of his home." Mancusi v. DeForte, 392 U.S. 364, 369 (1968) (citations omitted). In Mancusi, the defendant was a vice president of a union who was indicted after state officials seized documents from his office without a warrant. The defendant sought to suppress the material seized during the warrantless search. The United States Supreme Court held that the search had violated the Fourth Amendment:

The record reveals that the office where [defendant] worked consisted of one large room, which he shared with several other union officials. The record does not show from what part of the office the records were taken, and [defendant] does not claim that it was a part reserved for his exclusive personal use. The parties have stipulated that [defendant] spent "a considerable amount of time" in the office, and that he had custody of the papers at the moment of their seizure.

We hold that in these circumstances [defendant] had Fourth Amendment standing to object to the admission of the papers at his trial. It has long been settled that one has standing to object to a search of his office, as well as of his home. Since the Court in Jones v. United States[, 362 U.S. 257 (1960),] explicitly did away with the requirement that to establish standing one must show legal possession or ownership of the searched premises, it seems clear that if [defendant] had occupied a "private" office in the union headquarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing. In such a "private" office, [defendant] would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors. It seems to us that the situation was not fundamentally changed because [defendant] shared an office with other union officers. [Defendant] still could reasonably

> have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups.

Id. at 368-69 (footnote and citations omitted); see also Hoffa v. United States, 385 U.S. 293, 301 (1966) (recognizing that when a person "puts something in his filing cabinet, in his desk drawer, or in his pocket, he has the right to know it will be secure from an unreasonable search or an unreasonable seizure"); Bender's Inc. v. Walker, 1 Fed. Appx. 317, 323 (6th Cir. 2001) (recognizing that "[i]t is well established . . . that an employee has a reasonable expectation of privacy in his office"); United States v. Anderson, 154 F.3d 1225, 1230 (10th Cir. 1998) (recognizing that "a court is more apt to find an employee has standing to challenge the seizure of personal items or the search of an area where personal items are stored than the search or seizure of work-related documents or materials. This is true even when an employee brings personal possessions into the workplace where they are obviously not as secure as they would be at home") (citations omitted).

In this case, we first note that the office in which the Phone was located was not within the area of the restaurant open to the public. As recognized by a leading treatise on criminal procedure,

> as an ordinary matter law enforcement officials may accept a general public invitation to enter commercial premises, which means they may enter those premises at the times they are open to the public and may explore those portions of the premises to which the public has ready access, including the examination of articles available for inspection by potential customers or other visitors. On the other hand, it is a search for police to enter without consent premises to which the public at large does not have access . . . .

Wayne R. LaFave et al., 2 Criminal Procedure § 3.2(e) (4th ed. Nov. 2025 update) (quotation marks and footnotes omitted); see also, e.g., Abilene Retail # 30, Inc. v. Bd. Of Comm'rs of Dickinson Cnty, 492 F.3d 1164, 1179 & n.14 (10th Cir. 2007) (noting, as to the issue of entry into a retail business area, that "[t]here is no barrier to officers entering any retail establishment during normal business hours to view those areas of the premises open to the public," but cautioning that conducting a search that involves more than plain-view observation may require more) (citation omitted); State v. Diaz, 58 P.3d 1257, 1268 (Haw. 2002) (holding that "an objectively reasonable expectation of privacy exists at the interior office door of a store"); Commonwealth v. DiMarzio, 756 N.E.2d 9, 13 (Mass. Ct. App. 2001) (recognizing that "if public access to a commercial area is limited or controlled,

- 17 -

then an individual does have a protectable privacy interest in the space") (citations omitted), aff'd on other grounds by Commonwealth v. DiMarzio, 767 N.E.2d 1059 (Mass. 2002). Rather, to reach the Defendant's office, it was necessary to go through a door into the kitchen, through a second door out of the kitchen, and through a third door into the office. These three doors, through which the public was not permitted, created at least some barrier implying privacy. Moreover, Ms. Kelso testified that although policy was not always followed, the door into the office was supposed to be kept locked, furthering a legitimate expectation of privacy. That the office was shared among several employees does not defeat an otherwise reasonable expectation of privacy. See, e.g., United States v. Ziegler, 474 F.3d 1184, 1189 (9th Cir. 2007) (recognizing that under Mancusi, "that the office was shared with a few other individuals [is] of no constitutional distinction" and "that in the private employer context, employees retain at least some expectation of privacy in their offices.") (citing Mancusi, 392 U.S. at 369).

Even if the office location did not sufficiently establish a legitimate expectation of privacy, thereby leaving the Defendant without a Fourth Amendment claim had the Phone been found lying on the top of one of the desks in the office, the Phone was not found lying out in the open. Rather, it was found concealed in a closed drawer bearing the Defendant's name.

The State makes much of the translucent nature of the Drawer. We are not persuaded. First, the drawers are not clear, see-through plastic, such as acrylic windows. Rather, they are semi-opaque, of a "cloudy" nature. Granted, when viewing the photographs of the bins, one can make out some of the objects lodged against the fronts of the drawers. However, to see all of the contents of any given drawer, the drawer must be opened. There is no testimony in the record indicating that the Defendant's phone was lodged against the front of the Drawer. Rather, Ms. Kelso testified that she opened the Drawer in order to find and retrieve the Phone.

We also deem significant the fact that each of the drawers was labeled with a name, indicating that each drawer belonged to a specific person (with the exception of one drawer, which bore the names of two employees). Moreover, because the photographs of the drawers reveal the nature of some of the objects kept therein, it is obvious that these drawers were used to store personal items. The storage of personal items in a closed container in a non-public office indicates a certain expectation of privacy by the owner of the items.

- 18 -

Finally, Ms. Kelso's testimony established that access to the drawers by anyone other than its "owner" was limited to business purposes and that persons accessing the drawers for non-business purposes were subject to discipline. She agreed with defense counsel's statement that "the managers who have those six storage bins should be able to rely on them, that they're secure, and that no one is going to take their property."

Turning to the Ross factors, it is undisputed that the Defendant owned the Phone and had a possessory interest in it. We also conclude that, based on the location of the Drawer that was labeled with the Defendant's name in an office not open to the public and behind a door that was supposed to be kept locked, the Defendant had a possessory interest in the Drawer and had the right to exclude others from opening it, subject only to it being opened for a legitimate business purpose. That the Defendant placed his phone in the Drawer exhibited a subjective expectation that the Drawer would remain free from governmental intrusion. By placing his phone in the Drawer and closing it, he took normal precautions to maintain his privacy. Finally, there is no dispute that the Defendant was legitimately on the premises of the office in the Texas Roadhouse when he placed his phone in the Drawer.

In sum, we agree with the trial court that the Defendant established a legitimate expectation of privacy in the Drawer such that he could properly claim constitutional protections against a warrantless government search of the Drawer.

C. In addition to upholding the warrantless search under the doctrine of third-party consent, which we hold was inapplicable to this search, the trial court also ruled that the search passed constitutional muster under the exception for exigent circumstances. The Defendant contends that the trial court erred in so ruling. We agree with the Defendant.

In its brief to this Court, the State declined to address the exigent circumstances issue as "unnecessary." Accordingly, the State has waived this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.") We nevertheless choose to address this issue on the merits.

"Exigent circumstances" is a well-recognized exception to the requirement that a search warrant be obtained prior to a search protected by the Fourth Amendment. See, e.g., State v. Reynolds, 504 S.W.3d 283, 304 (Tenn. 2016). In Reynolds, the Tennessee Supreme Court explained that

> [t]he exigent circumstances exception applies when the "urgent need for immediate action becomes too compelling to impose upon governmental

- 19 -

actors the attendant delay that accompanies obtaining a warrant. When the exigent circumstances exception is the proffered basis for a warrantless search, a reviewing court must determine "whether the circumstances g[a]ve rise to an *objectively reasonable belief* that there was a compelling need to act and insufficient time to obtain a warrant." In making this determination, a court considers "the totality of the circumstances known to the governmental actor" at the time of the warrantless search or seizure. The State may point to any "specific and articulable facts and the reasonable inferences drawn from them" available at the time of the warrantless search or seizure. A reviewing court evaluates the circumstances "from an objective perspective; the governmental actor's subjective intent is irrelevant."

Id. at 304-05 (citations omitted) (emphasis added).

Here, the trial court found the existence of exigent circumstances based on the Defendant's character and the fact that the Defendant had "lied" to police officers about the location of his phone. The trial court found as follows:

> It wasn't in his car because he lied. Now, *if he's bold enough and perverted enough to have sex with an underage girl* that he works with in her own house in her bedroom when her mother is sleeping, and videoing the encounter, I think that *he would be bold enough to try to do anything*, because he's already lied, *to destroy the evidence of his perversion* after he's caught and arrested.
>
> . . . .
>
> Now, the defendant had already lied and sent the officers on a two-and-a-half hour wild goose chase [while they obtained a search warrant to search his car]. In my opinion *he's not beyond doing anything he can to locate somebody and tell them please go into that office and get my phone.* That is not beyond belief. That is not beyond probability. There is an extremely good likelihood knowing the defendant, *his character*, and what he had done and how he had lied and how much that evidence was valuable to him. So I believe there is a good case for exigent circumstances to apply in this particular case.

(Emphases added). The trial court's reasoning fails because, regardless of his prior conduct, there is no proof in the record that the Defendant had any means of contacting anyone after his arrest and arranging for the retrieval of his phone before it was located by police officers. The proof established that after the Defendant was arrested, he was

- 20 -

transported to jail. The Defendant did not know that the police were seeking his phone until his arrest. There is simply no proof in the record that the Defendant had the opportunity or means to have the Phone hidden in some manner after learning that it was being sought. Indeed, the proof establishes that a significant period of time passed between his being taken into custody and the Phone being found in the Drawer. Clearly, the Defendant had been unable during that time to arrange for its disposal. Detective Garcia's vague testimony that he had "read cases about" remote alterations to information stored on cell phones was simply not sufficient to support a finding of exigent circumstances. See, e.g., State v. Curtis, 964 S.W.2d 604, 610-11 (Tenn. Crim. App. 1997) (when "officers could not point to any circumstance which led them to believe someone was about to destroy the evidence," their "generalized fears" would "not support a finding of exigent circumstances") (citing United States v. Becker, 23 F.3d 1537, 1541 (9th Cir. 1994)).

Moreover, neither detective offered any proof about any urgency he perceived with respect to recovering the Phone. Clearly, Detective Garcia felt no need to break into the Defendant's car to retrieve the Phone prior to obtaining a search warrant for it, despite the concerns he later voiced at the hearing about remote deletions. And as to Detective Chambers, it appears that he was simply seeking a time-saving shortcut to avoid the necessity of obtaining another search warrant. Finally, as pointed out by the defense in its brief, the trial court's reference to the Defendant's character as a factor indicating exigent circumstances was wholly inappropriate. We hold that the warrantless search of the Drawer was not saved by the exception for exigent circumstances.

In sum, we hold that the warrantless search of the Drawer by a government agent ran afoul of the federal and state constitutions. That holding does not end our consideration of the matter however.

D. Evidence obtained pursuant to an unconstitutional search is not automatically suppressed pursuant to the exclusionary rule. Under the "inevitable discovery doctrine," the contested evidence may still be ruled admissible when "the evidence would have been discovered through an independent, proper avenue that comports with the Fourth Amendment." State v. Scott, 619 S.W.3d 196, 204 (Tenn. 2021). As our Supreme Court stated in Scott,

> Tennessee courts have long interpreted the inevitable discovery doctrine as requiring more than a mere showing that evidence *could have* been obtained through independent and lawful means; rather, the proof of inevitable discovery must show, with a level of certainty, that the evidence *would have* been obtained based on "no[n]-speculative elements . . . focuse[d] on demonstrated historical facts capable of ready verification or impeachment." This fact specific inquiry requires this Court to examine if

the record provides sufficient proof that the evidence *would have*, not just *could have*, been inevitably discovered through independent lawful means.

619 S.W.3d at 205 (citations omitted) (alterations in original). We hold that, under the facts of this case, the proof supporting the Defendant's convictions would have been so discovered.

We begin by noting that the evidence supporting the Defendant's convictions in this matter was not recovered from the Phone. Rather, it was recovered from the Devices. Thus, it behooves us to consider the proof available to the police prior to their recovery of the Phone, as well as the crime they were investigating.

Initially, the Defendant was being sought because of his sexual encounter with the Minor. He had been observed having sex with her and videoing the encounter on his phone. When interviewed by the police, the Minor confirmed the sexual encounter and also revealed incriminating texts between her and the Defendant and at least one sexually explicit video of him on her phone. The police thereby had probable cause to seek the Defendant's phone as corroborating evidence of his statutory rape of the Minor. Indeed, a judge determined that probable cause existed to seize the Phone when he or she issued a search warrant for the Defendant's vehicle.

Had the police not recovered the Phone at the Texas Roadhouse, they would have had probable cause to seek it at his home on the same grounds that they had probable cause to seek it in his car, because the Defendant had told them, initially, that it was at his home. Additionally, the Phone had unsuccessfully been sought in the Defendant's car, bolstering the probability that it would be found at the Defendant's home. Indeed, Detective Garcia testified that, had the Phone not been recovered by Ms. Kelso, he would have sought a search warrant for the Phone at the Defendant's home based on the Defendant's initial declaration of its location. We are confident that such a search warrant would have been issued. Upon obtaining and executing the search warrant for the Defendant's home, the police would have found the two cell phones in the Defendant's bedroom that we have identified above as two of the Devices. We note that, at this stage of the proceedings, the police had no way of knowing the particulars of the Phone and so would have been legitimately searching for and seizing any cell phone found. It was the two cell phones in the bedroom, and not the Phone, that contained the images providing the basis for this prosecution as opposed to the statutory rape prosecution. And the images recovered from those cell phones would have provided probable cause to support a second search of the Defendant's home for additional devices capable of storing illegal images. Thus, all of the Devices would have been "inevitably discovered through independent lawful means." Scott, 619 S.W.3d at 205.

- 22 -

The record in this case establishes that, with the regrettable exception of the actions of Detective Chambers, the police were assiduous in seeking search warrants for items indicative of the Defendant's criminal behavior. Not only did they obtain a search warrant for the Defendant's car, but they also obtained a search warrant for the Phone after it had been recovered; a second search warrant for a more extensive search of the Phone; a search warrant for the Defendant's home; a warrant to search the Devices; a warrant for the Defendant's DNA; a warrant for the Defendant's Snapchat account; and a warrant for the Minor's Snapchat account. Although we have determined that Detective Chambers committed an unconstitutional search of the Defendant's workplace, nevertheless, the care with which the police sought the other evidence in this case demonstrates that, but for Detective Chambers' error, they would have sought and obtained a search warrant enabling them to recover the two cell phones located at the Defendant's home. Those two cell phones would, in turn, have led to the recovery of the remaining Devices. Thus, the incriminating evidence used in this prosecution would have been obtained through inevitable discovery, and the Defendant is not entitled to have this evidence suppressed pursuant to the exclusionary rule.

II. <u>Second Motion to Suppress.</u> We turn now to the Defendant's second motion to suppress. As set forth above, the Defendant's second motion to suppress was aimed at the search warrant issued for the Defendant's home. The Defendant alleged that the affidavit in support of the search warrant failed to establish probable cause, thereby rendering the search warrant defective. The trial court denied this second motion to suppress, ruling that the affidavit was sufficient to establish probable cause.

The United States and Tennessee Constitutions state that search warrants shall issue only upon probable cause. <u>See</u> U.S. Const. amend. IV; Tenn. Const. Art. 1, § 7. "A sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an 'indispensable prerequisite' to the issuance of a search warrant." <u>State v. Saine</u>, 297 S.W.3d 199, 205-06 (Tenn. 2009) (quoting <u>State v. Henning</u>, 975 S.W.2d 290, 294 (Tenn. 1998)). "To ensure that the magistrate exercises independent judgment, the affidavit must contain more than mere conclusory allegations by the affiant." <u>Henning</u>, 975 S.W.2d at 294. "The affidavit must include facts from which the neutral and detached magistrate may determine, upon examining the affidavit in a commonsense and practical manner, whether probable cause exists." <u>State v. Tuttle</u>, 515 S.W.3d 282, 300 (Tenn. 2017) (citing <u>State v. Smotherman</u>, 201 S.W.3d 657, 662 (Tenn. 2006); <u>Henning</u>, 975 S.W.2d at 294).

In <u>Tuttle</u>, the Tennessee Supreme Court held that a totality of the circumstances analysis must be used when determining whether an affidavit establishes probable cause for the issuance of a warrant under the Tennessee Constitution, overruling <u>State v. Jacumin</u>, 778 S.W.2d 430 (Tenn. 1989). <u>Id.</u> at 289. "An appellate court considering whether

probable cause supported issuance of a search warrant, 'may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant.'" Tuttle, 515 S.W.3d at 299 (quoting Henning, 975 S.W.2d at 295). The reviewing court must determine whether the evidence, when viewed as a whole, provided the magistrate with a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing. Id. (internal quotation marks and citation omitted). The probable cause determination made by a neutral and detached magistrate is entitled to great deference by a reviewing court. See Saine, 297 S.W.3d at 207.

"An affidavit may include information that would not be admissible as evidence in a criminal trial, and an affidavit need not reflect the direct personal observations of the affiant." Tuttle, 515 S.W.3d at 301 (citing Brinegar v. United States, 338 U.S. 160, 172-73 (1949); Henning, 975 S.W.2d at 294; Jacumin, 778 S.W.2d at 432). The Tennessee Supreme Court has provided guidance regarding the reliability of hearsay information included in an affidavit:

> The reliability of hearsay information included in an affidavit is evaluated differently, however, depending upon its source. State v. Williams, 193 S.W.3d 502, 507 (Tenn. 2006). If the source of the information is a law enforcement officer, "[n]o special showing of reliability is necessary." Smotherman, 201 S.W.3d at 663 (citing [United States v.] Ventresca, 380 U.S. [102,] 111 [(1965)], 85 S.Ct. 741). But this presumption of reliability applies only if the affidavit states that the "information [was] provided by other officers." Id. (citing United States v. Kirk, 781 F.2d 1498, 1505 (11th Cir. 1986)). A presumption of reliability also applies to citizen informants, so long as the affidavit identifies the source of the information as a citizen informant. Williams, 193 S.W.3d at 507.

Tuttle, 515 S.W.3d at 301. However, no presumption of reliability applies to information provided by unknown informants or informants from the "criminal milieu." Id. Under the totality-of-the-circumstances analysis adopted in Tuttle, an "informant's basis of knowledge and veracity or credibility remain highly relevant considerations" in the probable cause determination. Id.

Initially, we agree with the defense that the affidavit in support of the search warrant for the Defendant's home was less than perfect in several respects. First, the affidavit contains no identifying information about the person or persons who allegedly observed the Defendant having sex with the Minor and recording the encounter on his cell phone. See Tuttle, 515 S.W.3d at 308 (emphasizing that an "informant's basis of knowledge and veracity or credibility remain highly relevant considerations" in the probable cause determination). Second, the affidavit should have contained at least some description of

the allegedly illegal images observed by Detective Garcia, rather than merely his conclusions about the nature of the images. See, e.g., United States v. Downsbrough, No. 3:13-CR-61, 2013 WL 5781570, at *11 (E.D. Tenn. Oct. 24, 2013) (recognizing that "the affiant's description of the alleged pornographic image must be sufficiently detailed to allow the issuing judge to make an independent determination of whether the image is child pornography, rather than relying solely on the affiant's conclusory statement that it is") (citations omitted). Nevertheless, we hold that the evidence recovered from the Defendant's residence was admissible pursuant to the good faith exception recognized by the Tennessee Supreme Court in State v. McElrath, 569 S.W.3d 565, 578 (Tenn. 2019), regardless of whether the affidavit established probable cause. As previously recognized by this court, we need not make the probable cause determination in order to assess the applicability of the good faith exception. See State v. Dillon, No. 03C01-9304-CR-00124, 1994 WL 510444, at *2-3 (Tenn. Crim. App. Sept. 19, 1994) (citing Illinois v. Gates, 462 U.S. 213, 264-65 (1983) (White, J., concurring)).

In McElrath, our high court adopted the good-faith exception to the exclusionary rule set out in Herring v. United States, 555 U.S. 135, 147-48 (2009), to wit, "when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements," the exclusionary rule should not be applied. 569 S.W.3d at 578 (internal quotation marks and citation omitted). In the context of search warrants, this good faith exception means that evidence will not be suppressed on the basis of the exclusionary rule where it was seized by police officers "in objectively reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922 (1984).Wi Thus, even if we were to hold that the search warrant for the Defendant's house was defective because it was based on an affidavit that failed to establish probable cause, evidence gleaned from the Devices recovered at the Defendant's home would nevertheless be admissible unless the record establishes that (1) the issuing magistrate was misled by information in the affidavit that Detective Brisco knew was false or would have known was false except for his reckless disregard for the truth; (2) the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp for the police; (3) the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) Detective Brisco's reliance on the warrant was not in good faith or objectively reasonable because the warrant was facially deficient. See Leon, 468 U.S. at 923 (citations omitted).

In his brief to this Court, the Defendant argues that the good faith exception is inapplicable because the affidavit in support of the search warrant "was so plainly deficient that a reasonable officer should not have relied on it." That is, the Defendant relies on the

third disqualifier for the good faith exception set forth in <u>Leon</u>: the "bare bones" affidavit. We disagree.

As the Court of Appeals for the Sixth Circuit has recognized,

> <u>Leon</u> identified several circumstances in which officers would be sufficiently blameworthy to trigger the exclusionary rule despite a judge's warrant (such as when the officers lie to obtain it). <u>See</u> <u>United States v. White</u>, 874 F.3d 490, 496 (6th Cir. 2017). As relevant here, <u>Leon's</u> good-faith exception to the exclusionary rule does not apply if an officer's affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923, 104 S. Ct. 3405 (citation omitted). This type of affidavit—what we have called a "bare-bones affidavit"—shows that the officer recklessly relied on the judge's decision that probable cause existed for the warrant. <u>White</u>, 874 F.3d at 496.

<u>United States v. Reed</u>, 993 F.3d 441, 450 (6th Cir. 2021). The United States Supreme Court has described bare-bones affidavits as those which rely on conclusory statements and fail to provide the magistrate with sufficient factual information upon which to determine the existence of probable cause. <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 239 (1983); <u>see also, e.g.</u>, <u>State v. Starnes</u>, W2016-02491-CCA-R3-CD, 2017 WL 5952930, at *3 (Tenn. Crim. App. Nov. 29, 2017) (referring to "bare bones affidavits" as those "containing only conclusory statements") (citing <u>Tuttle</u>, 515 S.W.3d at 308).

We hold that the affidavit in this case was not so lacking in factual information as to render it a "bare bones affidavit" such that the good faith exception under <u>Leon</u> is unavailable. The affidavit indicated that a witness had observed the Defendant engaging in criminal conduct with a minor; that there was sufficient proof of the Defendant's criminal conduct with the minor to have supported his arrest; and that following an examination of the Defendant's cell phone, there was sufficient proof to support the Defendant's subsequent arrest for possession of child sexual exploitation material. While not ideal, this affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Accordingly, the Defendant is not entitled to relief on this basis.

III. <u>Sentencing.</u> We turn now to the Defendant's sentence. In his brief to this Court, the Defendant argues that the trial judge improperly applied the enhancement factor for vulnerable victims; improperly refused to consider the STRONG-R needs and assessment report; and impermissibly based his sentencing decision on his personal religious beliefs. Because we have determined that the trial court committed at least three significant errors in imposing sentence in this case, we conclude that the trial court abused its discretion in

sentencing the Defendant.  See State v. Richmond, No. M2021-01025-CCA-R3-CD, 2022 WL 4372220, at *10 (Tenn. Crim. App. Sept. 22, 2022) (recognizing that "[c]umulative errors at sentencing may warrant a new sentencing hearing even though individual errors do not require relief") (citing State v. Miles, No. 03C01-9812-CR-00447, 1999 WL 1191535, at *11 (Tenn. Crim. App. Dec. 16, 1999)).  Accordingly, we remand this matter for a new sentencing hearing to be conducted in accordance with statutory authority and the appellate courts' interpretations of that authority.

The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing."  State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed."  Id. at 706.  Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  Id.  "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld."  Id.  Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."  Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing        alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).  The defendant has the burden of showing the impropriety of the sentence on appeal.  Id. § 40-35-401(d), Sentencing Comm'n Cmts.  In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment.  Id. §§ 40-35-102(3)(C), -103(5).  In addition, the court must

impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

We first turn to the trial court's application of the enhancement factor based on a victim's being "particularly vulnerable because of age or physical or mental disability." Tenn. Code Ann. § 40-35-114(4). As this Court has recognized, the application of this enhancement factor requires the State to prove that the victim(s) in question suffered from such physical and/or mental limitations as to render them unable to resist the offense or that caused them some difficulty in calling for help or in testifying against the perpetrator. See State v. Osborne, 251 S.W.3d 1, 27 (Tenn. Crim. App. 2007) (citing State v. Kissinger, 922 S.W.2d 482, 487 (Tenn. 1996); State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993)). Before determining that the State has met its burden, the trial court must consider several factors and must make factual findings. Id. (citing State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997)). The trial court "'should consider whether evidence in the record with regard to the victim's age or physical and mental attributes demonstrated an inability to resist the crime, summon help, or testify at a later date.'" Id. (quoting Poole, 945 S.W.2d at 97).

In this case, the State did not seek the application of this enhancement factor. Accordingly, it did not present the relevant proof, and the trial court did not make the necessary factual findings. The trial court erred in applying this enhancement factor. Indeed, the State all but concedes this point in its brief to this Court but argues that the remaining enhancement factors applied by the trial court support the imposition of the maximum sentences on all counts. Because we are remanding this matter for a new sentencing hearing, we need not respond to this argument.

We turn now to the trial court's rejection of the STRONG-R risk and needs assessment report included in the Defendant's presentence report. Tennessee Code Annotated section 40-35-210(b)(8) provides, "[t]o determine the specific sentence and the appropriate combination of sentencing alternatives that shall be imposed on the defendant, the court *shall* consider the following: [t]he result of the validated risk and needs assessment conducted by the department [of correction] and contained in the presentence report." (Emphasis added). When confronted with the Defendant's risk and needs report, the trial court proclaimed the following:

> And I find absolutely *incredible* – and the state probation officers can make a note of this. I've said this many, many times. This STRONG-R is *ridiculous* – a moderate risk [to reoffend]. What in the world is going on with these people? Moderate risk?

- 28 -

Sometimes people like that that look at statistics need to get in the real world and see what's going on.

(Emphases added).

The State argues in its brief to this Court that the trial court's statements reflect not a rejection of the report, but merely a refusal to give it significant weight. We disagree. The trial court labeled the report both "incredible" and "ridiculous." The trial court's terminology indicates its outright refusal to consider the report, apparently because of the report's conclusion that the Defendant was at only a "moderate" risk to re-offend.

This Court recently opined that a trial court's failure to give due consideration to the risk and needs assessment required a new sentencing hearing. See State v. Ross, No. E2023-00381-CCA-R3-CD, 2024 WL 2954404, at *6 (Tenn. Crim. App. June 12, 2024). In that case, the assessment was missing from the presentence report. In this case, the trial court's refusal to consider the assessment was, in our view, an equivalent omission requiring the equivalent remedy.

Finally, we consider the trial judge's numerous references to his religious beliefs during the sentencing hearing, set forth above. This Court has chastised the trial judge on at least two previous occasions for improperly interjecting his own religious concerns into a sentencing hearing. See Richmond, 2022 WL 4372220, at *13 (agreeing with the defense "that the trial court's religious comments in this case were improper" and noting that "[t]his court previously has advised this same trial court to refrain from making religious remarks during sentencing") (citing State v. Lenarduzzi, No. M2012-01236-CCA-R3-CD, 2013 WL 436443, at *8 (Tenn. Crim. App. Feb. 5, 2013)); Lenarduzzi, 2018 WL 436443, at *9 (stating that the "better practice" would be for the trial court to refrain from making biblical references during sentencing). And, as we have previously noted, our statutory sentencing scheme provides specifically that "[s]entencing should exclude all considerations respecting . . religion of the . . . individual." Tenn. Code Ann. § 40-35-102(4). Moreover, the Tennessee Supreme Court has recognized that "[r]eference to religious law during a criminal trial has been disapproved in this State, and trial court judges should therefore refrain from any discussion on religious law." State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994), abrogated on other grounds by State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003).

In spite of these rebukes, the trial judge yet again engaged in these prohibited references in this case. We must surmise one of two scenarios: either the trial judge does not read those of our opinions that resolve appellate cases arising out of his court or, more troubling still, that he feels free to ignore our admonitions. In either event, we hold that, on the basis of the trial court's misapplication of an enhancing factor, its refusal to comport

- 29 -

with the statutory requirement that it consider the risk and needs assessment, and its improper religious references, the trial court abused its discretion in imposing sentence on the Defendant. Accordingly, we vacate the Defendant's sentence and remand this matter for a new sentencing hearing. We express our sincere desire that the trial judge conduct the Defendant's new sentencing hearing with appropriate deference to the law, both statutory and as interpreted by the decisions of Tennessee's appellate courts.

## CONCLUSION

Albeit on different grounds, we affirm the trial court's denial of the Defendant's two motions to suppress and, accordingly, affirm the Defendant's convictions. Because the trial court abused its discretion in sentencing the Defendant, we vacate the Defendant's sentence and remand this matter for a new sentencing hearing.

s/ **Camille R. McMullen**

CAMILLE R. MCMULLEN, JUDGE